LEWIS PUBLISHING COMPANY *v.* MORGAN, POSTMASTER IN NEW YORK CITY.

JOURNAL OF COMMERCE AND COMMERCIAL BULLETIN *v.* BURLESON, POSTMASTER GEN-ERAL OF THE UNITED STATES.[1]

APPEALS FROM THE DISTRICT COURT OF THE UNITED STATES FOR THE SOUTHERN DISTRICT OF NEW YORK.

Nos. 819, 818. Argued December 2, 3, 1912.—Decided June 10, 1913.

From the beginning Congress, in exerting its power under the Constitution to establish post-offices, has acted upon the assumption that it is not bound by any hard and fast rule of uniformity, and has always assumed the right to classify in its broadest sense.

Congress always has given, and subject only to the express limitations of the Constitution, can give, special mail advantages to favor the circulation of newspapers, and has also fixed the general standard and imposed conditions upon which these privileges can be obtained.

The provisions in § 2 of the Post Office Appropriation Act of 1912 regarding publications and conditions under which they can be carried in the mail construed and *held*, that:

Those provisions are intended simply to supplement existing legislation relative to second class mail matter, and not as an exertion of legislative power to regulate the press, curtail its freedom or to deprive one not complying therewith of all right to use the mail service.

A provision in a departmental appropriation act gives rise to the inference that it concerns the general subject under control of that Department.

A provision in a post-office appropriation act referring to the entering of mail matter refers to second class mail as that is the only class to which the word " enter " can apply.

Requirements in the second paragraph of a statutory provision *held* to apply to articles enumerated in the preceding paragraph

---

[1] See *post*, p. 600, for proceedings on motion for restraining order in this case.

when the words used cannot otherwise be reasonably construed, and when it also appears that as passed by the first enacting chamber the two paragraphs subsequently divided were embodied in one paragraph.

A penalty of denial of the privileges of the mail for failure to comply with requirements applicable only to second class matter does not amount to entire exclusion from use of the mail.

Requirements in regard to publications entitled to be entered as second class mail and sanctioned by the penalty of exclusion from the privileges of such second class, are not to be construed as independent regulation of such publications, but only as condition precedent to retaining the privileges of second class mail after entry of the publication; and so *held* as to the provision that paid for matter in periodicals must be marked " advertisement " under penalty of exclusion from the privileges of the mail.

Legislative history of a statute can be examined to enable the court to construe it.

The requirements in § 2 of the Post Office Appropriation Act of 1912 that certain specified information be presented to the Postmaster General and that all paid for matter, editorial and otherwise, be marked " advertisement " under penalty of exclusion from the privileges of the mail, *held*, not to be an unconstitutional abridgment of the freedom of the press protected by the First Amendment or a denial of due process of law under the Fifth Amendment, or as a denial of the use of the mail, but only a requirement relating to second class mail matter sanctioned by exclusion from the privileges of the mail in that regard.

THE facts, which involve the constitutionality and construction of the provisions in the Post Office Appropriation Act of 1912 in regard to privileges of second class mail matter accorded to magazines and other publications, are stated in the opinion.

*Mr. James M. Beck,* for Lewis Publishing Company, appellant in No. 819:

To adopt the Government's narrow construction of this statute would be judicial legislation. Its provisions are plain and free from ambiguity. Failure to comply with its requirements subjects "every newspaper" to a denial

of "the privileges of the mails"—not the advantages of second class rates only, but the privilege of using the mail for any purpose.

The act has been thus interpreted by the Attorney General, the Postmaster General, the press and the public. Its position in the appropriation act confirms this interpretation, for it is not included in the subdivision relating to second class matter, but in that which deals with miscellaneous and general legislation. The views expressed by its proponents in Congress confirm the same interpretation.

The present attempt to restrict its meaning was an afterthought to save its constitutionality.

While it is true that this court will accept of two "reasonably susceptible" interpretations the one which is most free from constitutional objection, yet this court should not, in applying this salutary doctrine legislate by reconstructing a statute. *United States* v. *Reese*, 92 U. S. 214; *James* v. *Bowman*, 190 U. S. 127.

Either construction of the statute, however, makes it unconstitutional. The difference is one of degree but not of kind. Congress can neither enlarge the powers of the Federal Government over the newspaper press by the duress of exclusion from the mails nor by the inducement of preferential rates. In either event such a statute is an attempted "accomplishment of objects not entrusted to the Government" and therefore "not the law of the land." *McCulloch* v. *Maryland*, 4 Wheat. 423. Otherwise Congress could indirectly legislate as to many matters which, under the Tenth Amendment, were reserved to the States, by the simple device of compelling a citizen to do things, in themselves beyond Federal power, if he wishes to use the mails, and such a privilege being vital, the citizen would have no choice but obedience to an unconstitutional statute.

This case draws sharply the vital issue between an

arbitrary and unrestricted Government and a restricted and free Government. Either Congress has, as the Solicitor General contends, the power to prescribe absolutely the conditions on which the citizen shall use the mails or Congress has only the power to prescribe such conditions as to the use of the mails as have a legitimate and appropriate reference to the carriage of the mails.

No encouragement is found for the former view in the decisions of this court. While asserting the exclusive and plenary power of Congress over interstate commerce (see *Lottery Cases*, 188 U. S. 331), this court denied that even a plenary power could be "arbitrary." Similarly, while this court has recognized the plenary power of Congress to determine what shall and what shall not be carried in the mails, yet such general expressions cannot sanction an arbitrary use of such power or justify statutory conditions imposed upon the exercise of a vital right, which have no legitimate relation to the carriage of the mails. Otherwise there would follow an indefensible extension of Federal power, of which neither the generation that framed the Constitution nor any succeeding generation until the present would have dreamed of as a possibility.

This current doctrine of the right to pervert Federal powers to accomplish extra-constitutional ends can be justly characterized as "nullification by indirection."

It is not the doctrine of this court, as is shown by the earlier decisions in *Marbury* v. *Madison*, 1 Cranch, 138, and *McCulloch* v. *Maryland*, 4 Wheat. 423, and the later decisions in the *Lottery Cases*, 188 U. S. 331, the *Employers' Liability Cases*, 207 U. S. 463, and *Adair* v. *United States*, 208 U. S. 161.

The other line of cases, commencing with *Veazie* v. *Fenno*, 8 Wall. 533, and ending with *McCray* v. *United States*, 195 U. S. 27, are not inconsistent. They were cases of express powers and arose under the taxing clause of the Constitution. This power is *sui generis* and exhausts

definition and a statute which on its face is a taxing statute cannot, except under very extraordinary circumstances, be invalidated by attributing to Congress a purpose other than to raise revenue. Moreover, the power to tax as a means to regulate industry was recognized long before the Constitution and has been recognized ever since.

A different question arises where the exercise of an alleged implied power is under consideration. Such power is confronted with the Tenth Amendment and can only be sustained under the power "to make all laws necessary and proper for carrying into execution the powers" expressly granted to Congress. A statute, therefore, like the present one, which claims to be thus "necessary and proper" must find its justification not only in the letter of the Constitution but in the facts of human life. To apply the acid test of Chief Justice Marshall (*McCulloch* v. *Maryland*, 4 Wheat. 423), it must be "appropriate" and "plainly adapted" and "consistent with the letter and spirit of the Constitution." This court has nullified nineteen acts of Congress because they were not as matter of fact plainly adapted to carry out the alleged constitutional grant and this legislation is of that class.

The statute also abridges the freedom of the press. The First Amendment means in substance that no burden or restriction should be imposed upon the press, excepting only in matters of recognized morality and subject always to responsibility at common law for libelous statements. The history, which preceded the First Amendment, clearly shows that it was made to prevent a censorship of the press either by anticipation through a licensing system or retrospectively by obstruction or punishment.

The compulsory disclosure to the public of the circulation of a newspaper is calculated to impair its influence and violate the privacy of its business. By compelling a public disclosure of the editors and owners of newspapers, the right to disseminate ideas impersonally is destroyed.

At the time the Constitution was adopted, nothing was more familiar to its framers than impersonal journalism. To this day we do not accurately know who wrote the letters of "Junius," and when the Constitution was adopted the most valuable arguments in its support were submitted anonymously by Madison, Hamilton, Jay and many others.

To compel a newspaper to use its own capital, labor facilities and valuable space, to disclose the most intimate secrets of its business to the public, is also a taking of private property without due process of law and without just compensation.

To concede to Congress the power to utilize the mails to discipline the free press of the country would hereafter mean a stricter and more dangerous censorship, for in the matter of arbitrary power, "the appetite grows by what it feeds on."

*Mr. Robert C. Morris,* with whom *Mr. Guthrie B. Plante* was on the brief, for Journal of Commerce, appellant in No. 818.

*The Solicitor General* for the United States:

The statute means that in order to obtain the low, second class postage rates all newspapers must comply with two requirements, to-wit:

(A) File with the Post Office Department and publish in the paper the name of the editor; and

(B) Mark as an advertisement any article for the publication of which the newspaper receives compensation; and, in default of so complying, shall be denied the second class postal rates.

The intent of Congress as deduced from the legislative history of the statute shows that Congress in its final enactment of the bill had the same intent that the House had in originally passing it, namely, merely to exclude

from the second class mail privileges all publications that did not comply with the requirements laid down in the act. The changes in the bill all related to the terms of the requirements, and were not intended to affect the broad principle that Congress (pursuant to its power to decide what should be carried by its mails) was limiting the use of the second class mail privileges to those newspapers that would comply with certain regulations which Congress felt it wise to impose as conditions upon such use.

A reasonable construction of the language used shows that the act only applies to newspapers using, or desiring to use, the second class mail privileges.

The words "this paragraph" refer to the whole subject of newspaper regulation.

The purpose of the special penalty for violating the advertisement clause is to enable the post office to properly enforce the act.

The true construction that should be adopted is, *First*, That Congress did not attempt to regulate all newspapers, magazines, etc., but only those that used the second class mail privileges; *Second*, That Congress prescribed certain things which those publications must do in order to continue the use of the second class privileges; *Third*, That Congress denied the use of the second-class privileges only to such publications as, after ten days' notice, still refused to comply therewith; and, *Fourth*, That Congress prescribed a moderate fine for any publication which (while complying with the first paragraph and thereby securing the continued use of the mails) inserted paid-for articles without marking them "advertisement."

This construction should be adopted, as any other might invalidate the statute.

Under the power to establish post offices and post roads, Congress has the absolute right to determine what matter may be carried in and what matter may be excluded from the mails; and it may declare the conditions on which it

will carry articles and that a given class of matter (newspapers, etc.) shall not be carried at the second class rate unless such matter conforms to every requirement Congress may prescribe. *Ex parte Jackson*, 96 U. S. 727; *In re Rapier*, 143 U. S. 110, 133; *Public Clearing House* v. *Coyne*, 194 U. S. 497.

The present statute is a mere exercise of the right to determine what shall be admitted to the mails.

Appellants' argument that Congress had no power to enact the statute in question is based on an assumed erroneous construction of the act.

In the exercise of an admitted power Congress may indirectly accomplish results which it would have no power to accomplish directly. *Employers' Liability Cases*, 207 U. S. 463, 502; *McCray* v. *United States*, 195 U. S. 27.

The statute is not a law "abridging the freedom of the press." *Francis* v. *United States*, 188 U. S. 375; *France* v. *United States*, 164 U. S. 676; *In re Rapier*, 143 U. S. 110.

The freedom of the press only imports the right to print and circulate, but does not give any vested right to use any particular postal rate.

The statute does not deprive appellants of either liberty or property without due process of law, nor does it take private property for public use without just compensation.

A court of equity will not, by injunction, restrain the prosecution of criminal proceedings. *In re Sawyer*, 124 U. S. 200, 210–211; *Harkrader* v. *Wadley*, 172 U. S. 148, 170; *Fitts* v. *McGhee*, 172 U. S. 516, 531–533; *Hemsley* v. *Myers*, 45 Fed. Rep. 283; *Wagner* v. *Drake*, 31 Fed. Rep. 849; *Logan* v. *Postal Telegraph Co.*, 157 Fed. Rep. 570; 2 Story Eq. Jur., § 893; High on Injunctions, 4th ed., § 68; Joyce on Injunctions, §§ 58–60a.

If the "advertisement" paragraph should be held void, it is separable and should not affect the validity of the balance of the statute. *Bank of Hamilton* v. *Dudley*, 2 Pet. 492; *Field* v. *Clark*, 143 U. S. 649, 695; *Income*

*Tax Cases,* 158 U. S. 601, 635; *Trade-Mark Cases,* 100
U. S. 82, 98; *Baldwin* v. *Franks,* 120 U. S. 678, 687;
*Poindexter* v. *Greenhow,* 114 U. S. 270, 304; *Employers'
Liability Cases,* 207 U. S. 463, 501; *Packet Co.* v. *Keokuk,*
95 U. S. 80, 89; *Presser* v. *Illinois,* 116 U. S. 252.

Mr. Chief Justice White delivered the opinion of
the court.

The Post Office Appropriation Act of August 24, 1912,
37 Stat. 539, 553, 554, c. 389, in § 2, contains the following:
"Sec. 2. . . . That it shall be the duty of the
editor, publisher, business manager, or owner of every
newspaper, magazine, periodical, or other publication to
file with the Postmaster General and the postmaster at
the office at which said publication is entered, not later
than the first day of April and the first day of October of
each year, on blanks furnished by the Post Office Depart-
ment, a sworn statement setting forth the names and post-·
office addresses of the editor and managing editor, pub-
lisher, business managers, and owners, and, in addition,
the stockholders, if the publication be owned by a corpora-
tion; and also the names of known bondholders, mort-
gagees, or other security holders; and also, in the case of
daily newspapers, there shall be included in such state-
ment the average of the number of copies of each issue
of such publication sold or distributed to paid subscribers
during the preceding six months: *Provided,* That the pro-
visions of this paragraph shall not apply to religious,
fraternal, temperance, and scientific, or other similar pub-
lications: *Provided further,* That it shall not be necessary
to include in such statement the names of persons owning
less than one per centum of the total amount of stock,
bonds, mortgages, or other securities. A copy of such
sworn statement shall be published in the second issue of
such newspaper, magazine, or other publication printed

next after the filing of such statement. Any such publication shall be denied the privileges of the mail if it shall fail to comply with the provisions of this paragraph within ten days after notice by registered letter of such failure.

"That all editorial or other reading matter published in any such newspaper, magazine, or periodical for the publication of which money or other valuable consideration is paid, accepted, or promised shall be plainly marked 'advertisement.' Any editor or publisher printing editorial or other reading matter for which compensation is paid, accepted or promised without so marking the same, shall upon conviction in any court having jurisdiction, be fined not less than fifty dollars ($50) nor more than five hundred dollars ($500)."

The two appellants, publishers of newspapers in the City of New York, complaining that this legislation abridged the freedom of the press protected by the First, and constituted a denial of the due process of law guaranteed by the Fifth, Amendment to the Constitution, filed their bills against designated officials of the United States to prevent the enforcement of the provision in question. The bills were dismissed for want of equity and this appeal was taken directly to this court, because of the rights asserted under the Constitution. Coming to define the controversy in order to appreciate and restrict the issues to the end that we may pass on none but the questions which are necessary to be decided, it is to be observed that there are some differences in the mode in which the cases are stated in the pleadings and in the argument. But after all, these divergencies give rise to no real distinction between the two cases and we hence treat them as one. At the outset, in order to state in the most direct way the grievances which the publishers deem they have suffered, we reproduce, retaining the italics, the statement made on that subject in the opening passages of the argument of the counsel for the Lewis Publishing Company:

"The newspaper law, whose constitutionality is in this suit called into question, is neither in form nor substance a law to regulate the carriage of the mails but *to regulate journalism.*

" In this respect it has the merit of sincerity: It does not pretend to be in aid of the Post Office Department. That Department did not seek its enactment but protested against it.

"The law in question makes no reference to the mails except that it uses exclusion therefrom *as a means of enforcing this censorship of the press.*

"Even this remote connection is wanting in the latter section of the law, which requires paid reading matter to be formally branded as an advertisement. Its enforcement is left to a criminal action for a penalty.

" The law has two plainly avowed objects.

" The first is to compel a disclosure to the Government, under oath, of the names and addresses of the editors, publishers, business managers and owners, stockholders, security creditors and the daily circulation of such newspapers for the preceding six months.

" *This will be hereafter referred to as the inquisitorial provision.*

" The second object is to compel a disclosure to the public through newspaper publication of these facts and also whether any editorial or reading matter in such publication has been inserted for a valuable consideration.

" *This will be hereafter referred to as the publicity provision.*

" The publicity provision cannot be referred to any proper function of the Post Office Department. Its function is to carry the mails and in such carriage it cannot matter whether *the public* are advised as to the ownership, editorial direction and circulation of a newspaper or not, or whether the matter which it publishes is published for a consideration."

And thus interpreting the assailed provision not as a

mere exertion of legislative power to additionally prescribe the conditions by which publishers might continue to enjoy the right to participate in the large pecuniary advantages and other privileges created in their favor through the classification of mail matter, but on the contrary treating the provision as a substantive exercise of a legislative authority not possessed and which unduly restricted the freedom of the press, thinly disguised as a regulation of the mails and enforcible by an absolute exclusion from the right to all mail service—the legal propositions advanced are as follows:

"1. The Constitution has not either under the Post Roads clause or elsewhere delegated to the Federal Government the power (1) to compel these disclosures and (2) to direct their publication or (3) to compel paid reading matter to be marked as an advertisement.

"2. The Constitution not only failed to give such power but it expressly forbade it, by the First Amendment, prohibiting any law 'abridging the freedom of the press.'

"3. The requirement that a certain class of newspapers shall disclose to the public by publication the most intimate details of their business, and use their own capital, labor facilities and valuable space for such disclosure, is a taking of 'liberty' and 'property' without due process of law and a like taking of valuable property rights for an assumed public use without just compensation."

On the other hand, putting aside what we deem to be minor subdivisions, broadly stated, all the contentions of the Government are reducible to the following: (a) That the assailed provision in no sense can be considered as an attempted exertion of power to regulate the freedom of the press or even as the exercise of the legislative authority to regulate the mails in the larger or general sense of that term since, when rightly construed, the provision only deals with what is known as second class mail matter, and imposes conditions necessary to be complied with to

enable publishers to participate in the great and exclusive
privileges and advantages which arise from the right to
use the second class mail.  (b) That the precedent condi-
tions thus imposed are relevant to the purpose which was
intended to be accomplished by Congress in creating the
second class mail privilege and are either directly or in-
cidently embraced in the power to regulate the mails and
in doing so to confer the second class privilege.  (c) That
even if these propositions be not well founded and the
provision be given the significance attributed to it by the
publishers, nevertheless it is valid as an exertion by Con-
gress of its power to establish post offices and post roads, a
power which conveys an absolute right of legislative selec-
tion as to what shall be carried in the mails and which
therefore is not in any wise subject to judicial control
even although in a given case it may be manifest that a
particular exclusion is but arbitrary because resting on
no discernible distinction nor coming within any discover-
able principle of justice or public policy.

From this statement of the opposing contentions it is
apparent that the first and fundamental cause of difference
arises from the widely conflicting views entertained con-
cerning the meaning of the assailed provision, and that
hence it becomes primarily necessary to settle such dif-
ferences, that is, to determine the true meaning of the
provision.  Moreover, as the controversy concerning the
meaning of the provision involves its relation to the law
concerning the carriage of newspapers in the mails in
force at the time of the passage of the provision and an
appreciation of its letter and spirit, it also becomes neces-
sary to consider that law, its origin and development.

An abstract of the laws relating to the postal service from
early Colonial times (1639), and under the Constitution
down to, and including the year 1888, will be found in
the report of the Postmaster General for the year 1888.
A condensed yet comprehensive statement of the general

results of the legislation from the first statute on the subject, February 20, 1792, 1 Stat. 232, c. 7, to the act of May 12, 1910, 36 Stat. 366, c. 230, is contained in the report of the Commission on Second-class Mail Matter, communicated by the President to Congress on February 22, 1912, pp. 13–18.

A consideration of the abstract made by the Postmaster General above referred to and of the synopsis contained in the report of the Commission, leaves no doubt that from the beginning Congress, in exerting the power to establish post-offices and post-roads, has acted upon the assumption that it was not bound by any hard and fast rule of uniformity, that is to say, that in exerting its power on the subject of the mails it has always considered that the right to classify in the broadest sense was enjoyed, and, consequently, depending upon conceptions of public good to be accomplished irrespective of the mere cost of carriage, the rates of mail have varied and the privileges accorded have changed from time to time. All the power which has been exerted is derived from the grant to Congress, in Art. I, § 8 of the Constitution to establish post-offices and post-roads. And the wise combination of limitation with flexible and fecund adaptibility of the simple yet comprehensive provisions of the Constitution are so aptly illustrated by a statement in the argument of the Government as to the development of the postal system, that we insert it as follows:

'Under that six-word grant of power the great postal system of this country has been built up, involving an annual revenue and expenditure of over five hundred millions of dollars, the maintenance of 60,000 post offices, with hundreds of thousands of employés, the carriage of more than fifteen billions of pieces of mail matter per year, weighing over two billion of pounds, the incorporation of railroads, the establishment of the rural free delivery system, the money-order system, by which more than a half

a billion of dollars a year is transmitted from person to person, the postal savings bank, the parcels post, an aeroplane mail service, the suppression of lotteries, and a most efficient suppression of fraudulent and criminal schemes impossible to be reached in any other way."

Only particularly concerned as we are with the legislation relating to the carriage of newspapers in the mails we need not stop to generally demonstrate the accuracy of the statements we have made. An abstract from and reference to the statutes chronologically arranged, relating particularly to discriminations in favor of the carriage of newspapers in the mail, will be found in a statement made by W. A. Glasgow, Jr., Esq., before the Postal Commission of 1906–7, forming part of House Document, vol. 98, beginning at p. 541. And a consideration of the statutes referred to in this abstract will demonstrate the legislative inauguration of and persistent adhesion to what is aptly described in the report of the Commission on Second-class Mail Matter as "the historic policy of encouraging by low postal rates the dissemination of current intelligence." Indeed, we think also that it is not open to controversy that a review of these statutes will demonstrate that it was always conceived not only that Congress might so exert its power as to favor the circulation of newspapers, by giving special mail advantages, but that it also possessed the authority to fix a general standard to which publishers seeking to obtain the proffered privileges must conform in order to obtain them. Nothing affords a more apt illustration of the assumed existence of the power in Congress to discriminate on the subject than was shown as early as 1845 by the act of March 3 of that year, 5 Stat. 736, c. 43, § 9, by which, although there was secured to the Government a virtual monopoly in the transportation "of any letters, packets, or packages of letters," by forbidding the establishment of "any private express or expresses" for their conveyance on mail routes, it was declared that the

restrictions should not apply to the transportation of newspapers, pamphlets, magazines and periodicals.

But it is useless to pursue the subject in detail, since as the result of legislation, beginning with the act of March 3, 1863, c. 71, 12 Stat., pp. 701, 704 *et seq.*, and embracing statutes which are noted in the margin,[1] it had come to pass on August 24, 1912, when the provision here assailed was enacted, that mail matter, disregarding mere subordinate subdivisions, was divided into four general classes, the first class embracing letters and printed matter, the second class covering newspapers and periodicals, the third, books and pamphlets and the fourth merchandise. And it is obvious and is not disputed, that the classification thus adopted was based, not upon merely inherent distinctions or differences in the nature and character of the articles as mailable matter and the cost of their carriage, but rested upon broad principles of public policy; in other words, upon the conceptions of Congress as to how far it was wise for the general welfare to give advantages to one class not enjoyed by another. It is not necessary to stop to enumerate the exceptional privileges, and great advantages which were offered to publishers of newspapers by the classification thus adopted, since it is not questioned that as a result of giving them the benefits of the second class rates, pecuniary advantages of great consequence to them resulted which when conjoined with the exceptional administrative and other privileges, which were accorded under that classification undoubtedly operated a very great discrimination in

---

[1] Act of June 8, 1872, c. 335, §§ 99 *et seq.*, 17 Stat. 283, 296; June 23, 1874, c. 456, §§ 5 *et seq.*, 18 Stat. 232; July 12, 1876, c. 179, § 15, 19 Stat. 78, 82; March 3, 1879, c. 180, § 7 *et seq.*, 20 Stat. 355, 358; June 9, 1884, c. 73, 23 Stat. 40; March 3, 1885, c. 342, 23 Stat. 385, 387; July 16, 1894, c. 137, 28 Stat. 105; June 6, 1900, c. 801, 31 Stat. 660; May 12, 1910, c. 230, 36 Stat. 366. See, also, act of August 24, 1912, 389, 37 Stat., p. 551.

their favor. It was obviously this result of the legislation which caused the Postmaster General at page 6 of his report to Congress, for the year 1907, to say that "by acts of Congress passed in 1874, 1879, 1885 and 1894, a privileged class has been created." And without going into detail or intending by citing them to treat the figures as being other than illustrative, the subject is illumined by a statement made in the brief for the Government, that the rate for first class or letter mail is of such a character as to produce a profit of seventy millions a year to the Government, while for the second or newspaper class the rates are such as to entail upon the Government a loss of seventy millions of dollars each year, a result which it is moreover stated is brought about by the fact that letter mail under the classification is subjected to a rate eighty times higher than that given newspapers under the second class and that while not so large, a very great discrimination also exists against the other classes and in favor of the second class.

But the mere distinction between the classes is not the only measure of the exceptional privileges accorded to publishers, for within the second class under which they are placed, advantages are given them not possessed by others in that class. For instance, the postage on a newspaper coming under the second class rate when mailed by an individual is higher than is the rate of postage exacted for the mailing of the same newspaper by publishers or news agents. While it cannot be questioned that the conferring of the special privileges above stated, were at least in form a discrimination against the public generally, beyond doubt, however, in the legislative mind they were deemed not to be of that character because the purpose of their bestowal was to secure to the public the benefits to result from "the wide dissemination of intelligence as to current events." Certain, however, as is this view, it is equally also certain that for the purpose of securing the

public benefits which it was conceived would result from the giving of the privilege, it was deemed that the power and duty existed to fix a standard which should be complied with by those who wished to enjoy the privilege,—a result manifested by the following provisions of § 14 of the act of March 3, 1879, c. 180, 20 Stat. 355, 359:

"Sec. 14. That the conditions upon which a publication shall be admitted to the second class are as follows:

"First. It must regularly be issued at stated intervals, as frequently as four times a year, and bear a date of issue, and be numbered consecutively.

"Second. It must be issued from a known office of publication.

"Third. It must be formed of printed paper sheets, without board, cloth, leather, or other substantial binding, such as distinguished printed books for preservation from periodical publications.

"Fourth. It must be originated and published for the dissemination of information of a public character, or devoted to literature, the sciences, arts, or some special industry, and having a legitimate list of subscribers; *Provided, however,* That nothing herein contained shall be so construed as to admit to the second class rate regular publications designed primarily for advertising purposes, or for free circulation, or for circulation at nominal rates."

And the long settled administrative practice in enforcing these conditions serves to show what was deemed to be their importance and the necessity for applying them to the end that the results intended to be accomplished by Congress might be realized. Prior to 1887 the enforcement of the conditions exacted as a prerequisite to the enjoyment of second class mail privileges depended upon the action of postmasters throughout the United States and although in the discharge of their duty they were governed by regulations and instructions promulgated by the Post Office Department, there was certainly laxity

and possible confusion. In 1887, to remedy this condition
under the authority conferred upon him by Rev. Stat.,
§ 396, the Postmaster General promulgated new rules and
regulations. It suffices briefly to point out the means by
which uniformity in administration was secured. Those
desiring to obtain the second class privileges were com-
pelled to make written application for entry of their pub-
lications at the local post office, to file copies of the pub-
lications, to make affidavit to the essential facts and to
make written answers to questions propounded which
were deemed to be essential to show the existence of the
conditions precedent imposed by the statute. A copy of
the questions required to be answered are in the margin.[1]

---

[1] From Postal Laws and Regulations—ed. 1902, p. 198.

V.—Applications for Entry of Publications as Second Class
Matter.

Sec. 438. When a publication, not included in sections 429 and 430
(see secs. 427 and 428), is offered for mailing for the first time at the
second-class rates of postage the postmaster shall require the proprietor
or his duly authorized representative to make and present to him, with
two copies of the publication, sworn answers in writing (on Form 3501)
to the following interrogatories:

(1) How often is the publication issued?

(2) Where is the "known office of publication"? (If in a city give
street and number.)

(3) Where is it printed?

(4) Who are the proprietors?

(5) Are they in any way interested pecuniarily in any business or
trade represented by the publication, either in the reading matter or in
the advertisements? If so, what is the interest?

(6) Who are the editors of the publication, and how is their com-
pensation determined?

(7) Have the editors any pecuniary interest in any business or trade
represented by the publication, either in the reading matter or in the
advertisements? If so, what is the interest?

(8) Can any house in good standing advertise in your publication at
the regular published rates?

(9) Are advertisements of competitors accepted at the usual rates?

(10) Have any of the business houses which advertise in your pub-

One controlling authority for passing upon all applications for entry was provided by vesting the Third Assistant Postmaster General with power to that end, that officer being authorized in case of approval of the application to empower the postmaster at the proper office to issue a certificate of entry. Upon the issue of the certificate it was made the duty of the publisher to print upon each copy of the publication, so entered, the following:

lication any interest (either by past connection or special contract) therein respecting advertisements or subscriptions? If so, what is the interest?

(11) What is the greatest number of copies furnished to any person or firm advertising in your publication?

(12) On what terms are these papers furnished?

(13) What number of copies do you print of each issue?

(14) What number of bona fide subscribers have you. for the next issue of your paper, made up as follows:

*a.* Direct individual subscriptions to publisher without premium?

*b.* Direct individual subscriptions to publisher with premium?

*c.* Direct individual subscriptions in clubs or through clubbing arrangements?

*d.* Copies regularly sold over publishers' counter to purchasers of individual copies?

*e.* Copies regularly sold by newsboys?

*f.* Regular sales of consecutive issues by news agencies?

*g.* Bulk purchases of consecutive issues by news agencies for sale without the return privilege?

*h.* Copies to advertisers, one to each to prove advertisement?

*i.* Bona fide exchanges, one copy for another, with existing second-class publications?

(15) What is the subscription price of your publication per annum?

(16) How many pounds weight will cover the papers furnished to regular subscribers?

(17) What average number of specimen copies with each issue do you desire to send through the mails at the pound rate?

(18) How are the names of the persons to whom sample copies are to be sent obtained?

(19) What disposition is made of the excess, if any, of copies printed over those furnished to subscribers, news agents, including newsboys, and as sample copies.

"Entered—at the post office at—as second class matter under the act of—."

It is true to say that these regulations promulgated in 1887, modified in some respects not material here to be considered, were continuously in force from their adoption up to the time the statutory provision here in question was enacted, and had therefore been in operation for about twenty-five years.

In the light of this statement concerning the evolution of the law, as to mail-matter and its classification, as it existed at the time the provision here involved was enacted, we come. to dispose of the. controversy as to the meaning of that provision, the question which we are called upon to solve being this:

Was the provision intended simply to supplement the existing legislation relative to second class mail matter or was it enacted as an exertion of legislative power to regulate the press, to curtail its freedom, and under the assumption that there was a right to compel obedience to the command of legislation having that object in view, to deprive one who refused to obey of all right to use the mail service? When the question is thus defined its solution is free from difficulty, since by its terms the provision only regulates second class mail, and the exclusion from the mails for which it provides is not an exclusion from the mails generally, but only from the right to participate in and enjoy the privileges accorded by, the second class classification.

The reasons which cause us to think this to be the case are these: (a) Because the provision is part of a post-office appropriation act and naturally therefore, gives rise to the inference that it concerns the general subject of the mails, there being an entire absence of anything justifying even a surmise, if such a point of view. could be indulged in under any circumstances, that Congress was intentionally exerting power not delegated to it and consciously

violating an express prohibition of the Constitution and for that reason clothed its exertion of power in the disguise of postal legislation; (b) because the text makes clear the fact that the legislation was exclusively addressed to the regulation of second class mail and was shaped in contemplation of the long established law and regulations governing that class. This result becomes apparent when it is observed that the provision makes it the duty of the publisher to "enter" his publication, since by practice and regulation prevailing during a long period of time, it had come to pass that the word "enter" had exclusive relation to a duty to be performed in order to obtain the benefits of the second class classification. In the absence, therefore, of some express indication to the contrary, no other conclusion is possible, than that the word was used with reference to its received official and administrative significance. In fact, in view of the history which we have given of the development of the second class classification, and the reasons which led to the system of entry, unless the settled significance of the word be given to it, it would have no meaning whatever.

Further, we think that because as finally enacted the provision which was in one paragraph as it passed the House of Representatives, in the Senate was divided into two paragraphs, affords no ground for contending that the requirement as to advertisements contained in the second printed paragraph is not embraced within and controlled by the conclusion we have stated. We say this because the second printed paragraph by reference clearly manifests that its provision applied to "such" newspapers, periodicals, etc., that is, the newspapers or periodicals covered by the first paragraph and which by its terms are submitted to the duty of entry in order to enjoy the privileges conferred. Nor do we think there is in reason ground to support the proposition that because the provision sanctioned the duty to make entry by an exclusion from

the mails it hence is a general regulation and not simply one conferring the right of availing of the second class privileges. The proposition assumes that the command is that for failure to comply with the conditions imposed there shall be a denial of the use of the mails, while in fact the provision is, there shall be a denial of the "privileges" of the mail, a qualification which in view of the great advantages given by the second class mail classification and of the fact that in the reports made to Congress concerning that classification, attention was directed to the circumstance that a privileged class was thereby created, goes to show the conscious purpose to provide only for the exceptional privileges with which the provision was dealing.

Equally wanting in force is the further contention that because the regulation in the second paragraph to the effect that paid matter shall be marked as advertisement is sanctioned by a penalty, therefore, at least as to such provision, an independent regulation of the press was intended, divorced from the requirements as to entry contained in the first paragraph. We reach this conclusion because when the paragraph referred to is accurately considered it makes more cogent the view we have taken and additionally demonstrates that the legislative mind in enacting it, was sensitively alive to the fact that the provision alone concerned the privileges of second class mail, and the administrative rule which for so many years prevailed on the subject. In other words, that as, under existing administrative regulations, the exactions as to entry contemplated conditions existing at the time of the application for entry, and the condition as to advertisements concerned conduct of a publisher after entry, which could not therefore be a condition precedent to entry, a penalty for the latter was devised in order to harmonize with the requirements as to admission to the second class mail.

But even if we were to omit the word privilege which qualifies the exclusion from the mails as provided in the first paragraph so as to cause the provision to read "shall be denied the (privileges of the) mails," there would be nevertheless no room for doubt. As we have seen, coeval with the establishment of the system of entry, as the means of securing the privileges of the second class mail and presumably because of the overshadowing advantages and benefits which were conferred by that system upon those entitled to participate in them, the right to such admission came to be indifferently described as "the entry to the mails of newspapers," etc., the "publications admitted to the mails," etc., and the duty which was cast upon the Third Assistant Postmaster General, in passing upon such subjects as "The responsibility of finally admitting such matters to the mail," etc. See the report of the Third Assistant Postmaster General contained in the report of the Department for the year 1887, at page 699, where, after referring to the regulations concerning entry, the quoted expressions are employed. Moreover, when it is considered that the provision was dealing only with the second class privilege, it cannot in reason be assumed that conditions were imposed dealing with a subject with which the statute was not concerned, in order thereby to afford ground for asserting it to be unconstitutional, when the elementary rule is that every reasonable intendment to avoid such a result must be indulged in. *United States v. Delaware and Hudson Co.*, 213 U. S. 366, 407. Without stopping however to review the subjects in detail we content ourselves with saying that we think neither the reference to expressions in debate, upon the concession for the sake of argument that they are competent to be looked at, nor an opinion of the Attorney General upon which reliance is placed, are adequate to control or modify the conclusion we have reached as to the meaning of the provision.

But granting that room for doubt remains after the analysis of the text, which has preceded, we are of opinion that the legislative history of the adoption of the provision makes that conclusion indisputable for the following reasons: 1. Since the bill as introduced in the House of Representatives, contained but one paragraph and obviously related to the privileges of the second class mail alone; 2d, because although the bill as reported to the Senate by the committee to which it was there referred, was somewhat modified as to the conditions exacted, and was divided into two paragraphs, the report of the committee leaves no doubt that there was no purpose to disintegrate the provision as it passed the House of Representatives, by making two enactments or to do anything more than to exact additional conditions for the right to enjoy the second class mail privileges, the latter result being clearly shown by the following excerpt from the report of the committee. (Report No. 955, p. 24.)

"The extremely low postage rate accorded to second-class matter gives these publications a circulation and a corresponding influence unequaled in history. It is a common belief that many periodicals are secretly owned or controlled, and that in reading such papers the public is deceived through ignorance of the interests the publication represents. We believe that, since the general public bears a large portion of the expense of distribution of second-class matter, and since these publications wield a large influence because of their special concessions in the mails, it is not only equitable but highly desirable that the public should know the individuals who own or control them."

As therefore the assailed provision when rightly construed only affixes additional conditions for admission to a privileged class of mail, and it was merely designed to provide for the continuance on compliance with designated conditions of a system under which vast sums of public

money were expended, to the end that the power and influence of the press might be expanded, it results that there was no foundation for the meaning attributed to the provision in question by the complainants and on which the grievances upon which they relied rested.

We come then to determine whether the provision as thus construed is valid. That Congress in exerting its power concerning the mails has the comprehensive right to classify which it has exerted from the beginning and therefore may exercise its discretion for the purpose of furthering the public welfare as it understands it, we think it too clear for anything but statement; the exertion of the power of course, at all times and under all conditions being subject to the express or necessarily implied limitations of the Constitution. From this it results that it was and is in the power of Congress in "the interest of the dissemination of current intelligence" to so legislate as to the mails, by classification or otherwise, as to favor the widespread circulation of newspapers, periodicals, etc., even although the legislation on that subject, when considered intrinsically, apparently seriously discriminates against the public and in favor of newspapers, periodicals, etc., and their publishers. Although in the form in which the contentions here made by the publishers which we have at the outset reproduced, as literally stated, seem to challenge this proposition by suggesting that the power of Congress to classify is controlled and limited by conditions intrinsically inhering in the carriage of the mails, we assume that such apparent contention was merely the result of an unguarded form of statement, since we cannot bring our minds to the conclusion that it was intended on behalf of the publishers to generally assail as an infringement of the constitutional prohibition against the invasion of the freedom of the press the legislation which for a long series of years has favored the press by discriminating so as to secure to it great pecuniary and other concessions

and a wider circulation and consequently a greater sphere
of influence.  If, however, we are mistaken in this view,
then, we think, it suffices to say that the contention is
obviously without merit.  This being true the attack on
the provision in question as a violation of the Constitution
because infringing the freedom of the press, and depriving
of property without due process of law, rests only upon the
illegality of the conditions which the provision exacts in
return for the right to enjoy the privileges and advantages
of the second class mail classification.  The question there-
fore is only this, Are the conditions which were exacted
incidental to the power exerted of conferring on the pub-
lishers of newspapers, periodicals, etc., the privileges of
the second class classification or are they so beyond the
scope of the exercise of that power as to cause the condi-
tions to be repugnant to the Constitution?  We say this
is the question since necessarily if the power exists to
legislate by discriminating in favor of publishers, the right
to exercise that power, carries with it the authority to do
those things which are incidental to the power itself or
which are plainly necessary to make effective the principal
authority when exerted.  In other words, from this point
of view, the illuminating rule announced in *McCulloch*
v. *Maryland* and *Gibbons* v. *Ogden*, governs here as it does
in every other case where an exertion of power under the
Constitution comes under consideration.  The ultimate
and narrow question therefore is, Are the requirements
of the provision in question incidental to the purpose
intended to be secured by the second class classification?

Let us consider the matter from the historical and from
the inherent standpoint.  Under the statute, as we have
seen, for a long series of years a publication primarily de-
voted to advertisements was not entitled to the benefit of
the second class classification, and by a long administra-
tive construction, embodied in the regulations, the dis-
closure of the names of the proprietors as well as of the

editors of a publication which has sought to be entered as second class matter was required. The new conditions imposed are first, that where there is matter the publication of which is paid for, the fact of such payment shall be disclosed by marking the matter as an advertisement, and second, the disclosure as to ownership, etc., previously exacted is enlarged by making it necessary in the case of a corporation to furnish the names of the stockholders and also requiring that the names of the principal creditors, etc., be given. As the right to consider the character of the publication as an advertising medium was previously deemed to be incidental to the exercise of the power to classify for the purpose of the second class mail, it is impossible in reason to perceive why the new condition as to marking matter which is paid for as an advertisement is not equally incidental to the right to classify. And the additional exactions as to disclosure of stockholders, principal creditors, etc., also are as clearly incidental to the power to classify as are the requirements as to disclosure of ownership, editors, etc., which for so many years formed the basis of the right of admission to the classification. We say this because of the intimate relation which exists between ownership and debt, since debt in its ultimate conception is a dismemberment of ownership and the power which it confers over an owner is by the common knowledge of mankind, often the equivalent of the control which would result from ownership itself. Considered intrinsically, no completer statement of the relation which the newly exacted conditions bear to the great public purpose which induced Congress to continue in favor of the publishers of newspapers at vast public expense the low postal rate as well as other privileges accorded by the second class mail classification can be made than was expressed in the report of the Senate committee, stating the intent of the legislation which we have already excerpted, that is, to secure to the public in

"the dissemination of knowledge of current events," by means of newspapers, the names not only of the apparent, but of what might prove to be the real and substantial owners of the publications, and to enable the public to know whether matter which was published was what it purported to be or was in substance a paid advertisement. We repeat that in considering this subject we are concerned not with any general regulation of what should be published in newspapers, not with any condition excluding from the right to resort to the mails, but we are concerned solely and exclusively with the right on behalf of the publishers to continue to enjoy great privileges and advantages at the public expense, a right given to them by Congress upon condition of compliance with regulations deemed by that body incidental and necessary to the complete fruition of the public policy lying at the foundation of the privileges accorded.

It may be deemed from what we have said in considering the asserted repugnancy of the conditions imposed by the provision under examination that we have assumed that if the attack made upon such conditions was well founded and they therefore would disappear, nevertheless the right to continue to enjoy the second class mail privileges would remain, but we have not considered that subject and intimate no opinion upon it.

Finally, because there has developed no necessity of passing on the question, we do not wish even by the remotest implication to be regarded as assenting to the broad contentions concerning the existence of arbitrary power through the classification of the mails, or by way of condition embodied in the proposition of the Government which we have previously stated.

*Decrees affirmed.*