**SECURITIES AND EXCHANGE COMMISSION, Plaintiff,**

v.

**Christopher L. LOWE a/k/a Chris L. Lowe, Lowe Publishing Corporation, Lowe Management Corporation, Lowe Stock Chart Service Inc., Defendants.**

**No. 82 Civ. 1616.**

United States District Court, E.D. New York.

Feb. 1, 1983.

S.E.C., N.Y. Regional Office by S. Jane Rose, Lawrence J. Toscano, Charles E. Padgett, Thomas R. Hickey, Jr., New York City, for plaintiff.

Schoeman, Marsh, Updike & Welt by Michael E. Schoeman, Elizabeth H. Cooper, New York City, for defendants.

## MEMORANDUM AND ORDER

WEINSTEIN, Chief Judge:

The Securities and Exchange Commission seeks an order enjoining Christopher Lowe and his corporations from publishing investment advisory materials. Jurisdiction is premised on Section 214 of the Investment Advisers Act of 1940, 15 U.S.C. § 80b–14 (1976). Lowe has been barred by the SEC from associating with any investment adviser and Lowe Management Corporation's investment adviser registration has been revoked.

Despite the substantial government interest in maintaining the integrity of the securities industry and the legitimate concern of the SEC about possible publication abuse, an injunction against publication must be denied except in a minor respect designed to insure against personal professional contact between Lowe and his readers. The Advisers Act, reasonably construed to avoid an impermissible encroachment on first amendment freedoms—particularly in light of available alternatives for safeguarding the public—does not authorize such prior restraint.

## I.

### FACTS

The SEC's lack of confidence in Lowe is not without basis. He was convicted in New York in 1977 of appropriating funds of an investment client and of failing to file as an investment adviser with New York's Department of Law. In 1978 he was convicted of tampering with evidence to cover up fraud on an investment client and of stealing from a bank. A New Jersey court sentenced him to three years imprisonment in 1982 on two counts of theft by deception through issuance of worthless checks.

Nevertheless, Lowe's urge to share his knowledge of finance continues unabated. Directly and through various corporations, he is responsible for a number of publications:

1. *The Lowe Investment and Financial Letter* is a market newsletter. A typical issue contains general observations on and assessments of the securities and bullion markets, a review of numerous market indicators, market strategies, and specific recommendations for buying, selling, or holding stocks and bullion. The newsletter is advertised as a semi-monthly publication, but at least since May 1981, it has appeared only at irregular intervals, with a total of eight issues appearing from that time through August 31, 1982. According to the publisher a year's subscription ordinarily costs $195, but a promotional subscription has recently been offered at reduced rates,

from $39 for one year to $79 for three years. The newsletter presently has approximately 2,408 subscribers whose subscriptions vary in length from three months to three years.

2. *The Lowe Stock Advisory* also analyzes and comments on the securities and bullion markets. This market letter specializes in low-priced stocks—costing under $20—listed on the New York and American Stock Exchanges and traded in the over-the-counter market. Potential subscribers are advised that they will receive periodic letters with market information and analysis and updated recommendation sheets on specific securities. Since May 1981, only four letters have been published and distributed, the last of which was dated November 16, 1981. They have included recommendations on various stocks. Lowe Stock Advisory subscriptions cost between $39 for one year and $79 for three years. Subscribers to the Lowe Investment and Financial Letter have been offered a complimentary six-month subscription. The publication has approximately 278 paid and 397 unpaid subscribers.

Both the Lowe Letter and Lowe Stock Advisory advertise a telephone hotline. Subscribers can call to get current information.

3. *The Lowe Stock Chart Service* has been advertised as a weekly publication containing charts for all stocks listed on the New York and American Stock Exchanges and for the 1,200 most widely traded over-the-counter stocks. It will also contain charts on gold and silver prices and market indicators. No investment advice will be offered. No issues of this publication have yet been distributed, though two announced dates for initial publication have come and gone. Regular subscription rates for the chart service run from $325 for three months to $900 for one year, with a special pre-publication offer including a $33 five-week trial. There are some forty subscribers to this publication.

Subscribers to these services called as witnesses by the SEC generally were satisfied with what they received. Their main

complaint was the lack of regularity of publication—an understandable problem in view of the amount of time the publisher has been devoting in recent years to defending himself before federal and state law enforcement agencies.

In 1979 the SEC instituted administrative proceedings against Lowe and Lowe Management Corporation. These culminated on May 11, 1981 in the Commission's order under section 203(e), (f) of the Advisers Act, 15 U.S.C. § 80b–3(e), (f) (1976), revoking the registration of the Lowe Corporation as an investment adviser and barring Lowe from association with any investment adviser. Advisers Act Release No. 759. The Commission based its order on an administrative law judge's finding that Lowe had misappropriated client funds (in the case leading up to Lowe's plea in New York State court to tampering with evidence) and that Lowe Corporation had failed to promptly amend its investment adviser registration (Form ADV) to disclose Lowe's New York convictions, in violation of section 204 of the Advisers Act, 15 U.S.C. § 80b–4 (1976), and Rule 204–1(b), 17 C.F.R. § 275.204–1(b) (1982). Lowe argued before the Commission that he had ceased to handle clients' funds and securities and was engaged solely in the publication of investment newsletters, so that the sanctions sought to be imposed were inappropriate and excessively severe. The Commission, however, agreed with the administrative law judge that the defendants' publication activities harbored "opportunities for dishonesty and self-dealing."

In the present suit the SEC alleges that the defendants have engaged in the business of an investment adviser without being registered pursuant to section 203(c) of the Advisers Act, 15 U.S.C. § 80b–3(c) (1976); that by not revealing to their subscribers Lowe's criminal convictions and the 1981 order of the Commission, they have engaged in fraudulent practices in violation of section 206 of the Act, 15 U.S.C. § 80b–6; and that in publishing the investment newsletters, they are in violation of the Commission's 1981 order, which is itself judicially enforceable under section 209 of the Act, 15

U.S.C. § 80b–9. The SEC seeks an order enjoining further publication by the defendants of investment advisory materials and enforcing the Commission's 1981 order, and an order directing defendants to disgorge all subscription monies received since 1981 in connection with their publications.

## II.

### LAW

The central issue is whether the SEC is authorized to withhold registrant status of anyone seeking to sell impersonal investment advice through subscription newsletters and by this denial to cut off publication. A further question is whether, under the statute and the rules and regulations of the Commission, defendants had a duty to disclose to their subscribers Lowe's convictions and the 1981 order of the Commission, so that their failure to do so constituted a fraud in violation of section 206 of the Act, 15 U.S.C. § 80b–6 (1976).

#### A. Advisers Act

Section 202(a)(11) of the Act, 15 U.S.C. § 80b–2(a)(11) (1976), defines "Investment Adviser" broadly. It includes:

> any person who, for compensation, engages in the business of advising others, either directly or through publications or writings, as to the value of securities or as to the advisability of investing in, purchasing, or selling securities, or who, for compensation and as part of a regular business, issues or promulgates analyses or reports concerning securities. . . .

The section provides an exemption for, inter alia, "(D) the publisher of any bona fide newspaper, news magazine or business or financial publication of general and regular circulation." Congress concluded that publications providing general business and financial information pose less dangers to the public than specialized advisory publications designed particularly for potential investors. Given the limited resources available to the SEC, Congress was entitled to direct the government's finite powers of

enforcement to the point of maximum danger.

The registration requirement and the relevant powers of the Commission are set forth in section 203, 15 U.S.C. § 80b–3 (1976). They are designed to control advisers and to prevent those who are not registered from giving investment advice. Subsection (a) declares it

unlawful for any investment adviser, unless registered under this section, to make use of the mails or any means or instrumentality of interstate commerce in connection with his or its business as an investment adviser.

Under subsection (c) the Commission is authorized to grant or deny applications for registration and under subsection (e) to censure, place limitations on the activities, functions, or operations of, suspend or revoke the registration of any investment adviser. The statutory grounds for imposing sanctions against registered advisers include having been convicted of any crime that "involves . . . the making of a false report . . . [or] perjury," or "involves the larceny, theft, robbery, extortion, forgery, counterfeiting, fraudulent concealment, embezzlement, fraudulent conversion, or misappropriation of funds or securities." 15 U.S.C. § 80b–3(e)(2). Subsection (f) empowers the Commission to censure, place limitation on, suspend, or bar the association of any person with an investment adviser.

These provisions of the Advisers Act are part of the comprehensive federal regulation of the securities industry. The impetus for federal securities regulation was the irresponsible and dishonest securities practices of the 1920's. H.R.Rep. No. 85, 73d Congress 1st Sess. 2 (1933); Landis, The Legislative History of the Securities Act of 1933, 28 Geo.Wash.L.Rev. 29, 30 (1959). Although the most pressing concerns of the drafters of the early securities laws were with issuers and underwriters, brokers and dealers, insiders and manipulative traders whose activities were most clearly and directly responsible for the collapse of the market, journalists were also implicated in securities deceptions. The Senate Report on the Securities Exchange Act of 1934 noted

that it was not uncommon for market operators to employ a publicity agent to tout a stock in which they were momentarily interested. In one instance a financial writer on a great New York newspaper was discovered to have been a regular participant in the profits of a free-lance trader, without obligation except to publicize the stocks of the trader. Another witness admitted that his business was "financial publicity," and that his articles were published for the purpose of interesting the public in the stock in which he and those who employed him were interested, thereby causing the market value of the stock to increase; and for his work he was paid by calls and options. Still other cases were observed where persons were employed to broadcast over the radio, ostensibly as economists tendering gratuitous advice, but in reality as publicity agents of stock-exchange firms.

S.Rep. No. 792, 73d Cong., 2d Sess. 8 (1934). A more particular account of potential and actual abuses in the publication of market newsletters and impersonal investment recommendations is found in the Report of Special Study of Securities Markets of the Securities and Exchange Commission, H.R. Doc. No. 95, 88th Cong., 1st Sess., Pt. 1, 330–44, 359–69, 535–39 (1963). ("SEC Special Report"). *See also, e.g., SEC v. Capital Gains Research Bureau, Inc.,* 375 U.S. 180, 84 S.Ct. 275, 11 L.Ed.2d 237 (1963) (publisher's practice of buying securities for his own account shortly before recommending them in his newsletter); *Courtland v. Walston & Co.,* 340 F.Supp. 1076 (S.D.N.Y.1972) (investment adviser's practice of recommending stocks to his private customers prior to making similar recommendations in his "influential and highly regarded weekly market letter"); *Zweig v. Hearst Corp.,* 594 F.2d 1261 (9th Cir.1979) (financial columnist reported favorably on a stock after purchasing 5,000 shares at a discount).

The justification for government oversight of investment advisory publications is

apparent. After the fact sanctions against offenders would likely prove inadequate. When an advisory service has improperly touted a stock and artificially inflated its price, the numerous investors who have relied on the recommendation and are hurt when the price of the stock subsequently collapses may be without redress. Assuming the publisher might be financially liable under the securities laws, *see Zweig v. Hearst Corp.,* 594 F.2d 1261 (9th Cir.1979), *but see Transamerica Mortgage Advisers, Inc. v. Lewis,* 444 U.S. 11, 100 S.Ct. 242, 62 L.Ed.2d 146 (1979), he may be unable to make restitution for the losses he has caused. Investors may encounter difficult problems of proof or may be unaware of the source of their injury. While criminal sanctions are provided in section 217 of the Advisers Act, 15 U.S.C. § 80b–17 (1976), they may not serve as an effective deterrent, given their necessarily spotty enforcement.

The principal mode of regulation employed in the securities laws is one of prophylactic disclosure rather than restraint. In his letter to Congress recommending passage of the Securities Act of 1933, President Roosevelt disclaimed any attempt at substantive government evaluation of securities offered to the public. Rather, the purpose of the legislation was to add

> to the ancient rule of caveat emptor, the further doctrine "let the seller also beware." It puts the burden of telling the whole truth on the seller. It should give impetus to honest dealing in securities and thereby bring back public confidence.

President's Message to Congress of March 29, 1933, *reprinted in* H.R.Rep. No. 85, 73d Cong., 1st Sess. 1, 2 (1933). A similar observation has been made by the Supreme Court with regard to the Advisers Act. In common with the other securities laws,

> [a] fundamental purpose [of the Advisers Act] was to substitute a philosophy of full disclosure for the philosophy of *caveat emptor* and thus to achieve a high standard of business ethics in the securities industry.

*SEC v. Capital Gains Research Bureau, Inc.,* 375 U.S. 180, 186, 84 S.Ct. 275, 280, 11 L.Ed.2d 237 (1963). *See also* 2 L. Loss, Securities Regulation 1396 (1961).

The disclosure philosophy has been employed in several ways to combat abuses committed by those who provide publicity for securities or render investment advice. Section 17(b) of the Securities Act of 1933, 15 U.S.C. § 77q(b) (1976), makes it unlawful to give publicity to a security for consideration without fully disclosing the receipt and amount of such consideration. Section 204 of the Advisers Act, 15 U.S.C. § 80b–4 (1976), empowers the SEC to require investment advisers, including those in the business of publishing advisory materials, to make and disseminate prescribed reports. Pursuant to this section the Commission has required every investment adviser whose registration is effective or pending to file Form ADV, containing detailed information on the adviser's background and expertise. Advisers Act Rules 204–1, 279.1, 17 C.F.R. §§ 275.204–1, 279.1 (1982). Rule 204–3, 17 C.F.R. § 275.204–3 (1982), requires certain advisers to provide some of this information to their clients. In response to documented abusive practices in the advertising for investment advisory services, including those promoting subscription publications, *see* SEC Special Report at 367–69, the SEC promulgated Rule 206(4)–1, 17 C.F.R. § 275.206(4)–1 (1982), under the anti-fraud provisions of section 206 of the Advisers Act, 15 U.S.C. § 80b–6 (1976). Among the provisions of the Rule is one that requires any advertising that makes reference to a successful past recommendation to offer to disclose all other recommendations made by the adviser within the preceding year.

The securities laws are sprinkled with provisions providing for restraints on practices that present dangers despite the most full and candid disclosure. The SEC has the authority to deny or revoke the registration of broker-dealers, 15 U.S.C. § 78*o* (b) (1976), and it is uncontested that the Commission has similar authority under section 203 of the Advisers Act, 15 U.S.C. § 80b–3 (1976), with respect to investment advisers who render personal investment

advice. The direct contact that these professionals have with clients and the control they may exercise over client funds justify strong sanctions in the way of prior restraints against those among them who have been guilty of misconduct.

The newsletter publisher, however, plays a role different from that of the broker-dealer or personal adviser, so that observations and procedures directed toward securities practitioners generally are not necessarily applicable to him. For example, in enacting the anti-fraud provisions of the Advisers Act Congress observed that the "occupations [of broker-dealers and advis-. ers] involve similar delegations of trust and responsibility." S.Rep. No. 1760, 86th Cong., 2d Sess., 1960 U.S.Code Cong. & Admin.News 3502, 3504. The analogy is apt for the personal adviser, but not for the editor of a market publication who has no direct person-to-person contact with his readers and to whom there is no delegation of authority.

In the Advisers Act the common grouping of personal and impersonal advisers need not imply that Congress intended that they be treated identically under all provisions or for all purposes. In particular, Congress may have assumed that disclosure of past misdeeds alone would be inadequate protection against an adviser who, through personal contact, could improperly dilute the force of such disclosure. The only effective protection would be a bar to the adviser's practice. But Congress might have concluded that disclosure was adequate in the case of an impersonal client who could more calmly weigh the gravity of the publisher's misdeeds against his advisory qualifications and in an unpressured atmosphere decide to accept or reject the publisher's services or recommendations.

Admittedly there is no suggestion on the face of the statute that persons whose only advisory activity is the publication of impersonal investment suggestions, reports, and analyses should be treated differently under section 203 from other persons within the definition of investment adviser contained in section 202. Nevertheless, this interpretation is suggested by constitutional considerations.

B. *First Amendment Considerations*

The constitutional protection afforded published investment advice may hinge on the characterization of this form of speech. The SEC has urged that it be classified as commercial speech, and thus subject to a greater degree of regulation and restraint than other publications. Even under the unfolding doctrines of commercial speech, however, restraint of subscription advisory material would pose serious constitutional questions.

The Supreme Court's most recent pronouncements in this area have set forth criteria under which commercial speech may be restrained. *Central Hudson Gas & Electric Corp. v. Public Service Commission,* 447 U.S. 557, 566, 100 S.Ct. 2343, 2351, 65 L.Ed.2d 341 (1980) provides a four-part test: 1) determine first whether the publication "concern[s] lawful activity and [is] not . . . misleading". If so the restraint will be upheld only if 2) "the asserted government interest is substantial"; 3) "the regulation directly advances the governmental interest asserted"; and 4) "it is not more extensive than is necessary to serve that interest."

The focus of this and other Supreme Court commercial speech cases has been on product and service advertising. In this regard the Court has noted that "the potential for deception and confusion is particularly strong in the context of advertising professional services." *In re R—— M. J——,* 455 U.S. 191, 203, 102 S.Ct. 929, 937, 71 L.Ed.2d 64 (1982). The Court, nevertheless, adhered to the principle that "restrictions upon such advertising may be no broader than reasonably necessary to prevent the deception." *Id.* The remedy against the potential for misleading advertising "in the first instance is not necessarily a prohibition but preferably a requirement of disclaimers or explanation." *Id.,* citing *Bates v. State Bar of Arizona,* 433 U.S. 350, 375, 97 S.Ct. 2691, 2704, 53 L.Ed.2d 810 (1977). These guidelines are presumably of general application in the commercial speech context.

Applying the Supreme Court's analysis, subscription advisory material is entitled to constitutional protection since it constitutes lawful activity and is not necessarily misleading. As indicated earlier, the government has a clear and substantial interest in preserving the integrity of the securities markets and preventing the demonstrated abuses that have attended dissemination of impersonal investment advice and analysis. It may be conceded that a regulatory regime under which a publication license could be denied those with a history of criminally fraudulent conduct would advance the government interest. Such individuals are reasonably suspect of a greater tendency to engage in abusive practices than are others whose records are free of the taint of trickery.

Nevertheless, publication restraint fails to meet the fourth criteria articulated in *Central Hudson Gas* for restricting commercial speech. Given the disclosure mechanisms available to the SEC to put subscribers on their guard against interested investment advice, the censorship that the SEC would impose on Lowe is more extreme than necessary to effectuate the congressional goal of a confident and informed investing public. *Cf. Friedman v. Rogers*, 440 U.S. 1, 11–13, 99 S.Ct. 887, 895–96, 59 L.Ed.2d 100 (1979) (upholding ban on trade names in the practice of optometry because trade names are subject to manipulation through use without explanation).

Prepublication restraints are ordinarily justifiable only where the non-protected character of the content is ascertainable with "relative certainty" prior to dissemination. *See* L. Tribe, American Constitutional Law 730 (1978). Even in the context of commercial speech speculative assessments may not be relied upon to curb first amendment exercise where the less drastic alternative of disclosure exists.

While a commercial speech analysis demonstrates the constitutional infirmities of publication restraint in this case, the SEC's premise that investment advisory publications constitute commercial speech is itself questionable. The Supreme Court has defined commercial speech as "speech which 'does no more than propose a commercial transaction,'" *Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 762, 96 S.Ct. 1817, 1825, 48 L.Ed.2d 346 (1976), *quoting Pittsburgh Press Co. v. Human Relations Commission*, 413 U.S. 376, 385, 93 S.Ct. 2553, 2558, 37 L.Ed.2d 669 (1973). *See also Central Hudson Gas & Electric Corp. v. Public Service Commission*, 447 U.S. 557, 562, 100 S.Ct. 2343, 2349, 65 L.Ed.2d 341 (1980). It has alternatively been described as "expression related solely to the economic interests of the speaker and its audience," *Central Hudson Gas*, 447 U.S. at 561, 100 S.Ct. at 2349, *quoted in In Re R___ M. J___*, 455 U.S. 191, 204 n. 17, 102 S.Ct. 929, 938 n. 17, 71 L.Ed.2d 64 (1982). Despite the broader sounding reach of the latter articulation, the cases employing the commercial speech doctrine have uniformly dealt with product or service advertising. *See Ad World, Inc. v. Township of Doylestown*, 672 F.2d 1136, 1140 (3d Cir.1982).

Investment advisory material disseminated to the public is not commercial advertising of a product or service. Such publications are not the words of a seller peddling his own wares or services, but those of an apparently detached observer commenting on the value of choses offered or held by others. To be sure the investment publisher has a financial motivation to disseminate his analyses and recommendations, but so may the literary publisher or political pamphleteer. Their motivations differ in kind from the monetary incentives characteristic of the advertiser of a particular product. The difference reflects in part basic distinctions "between commercial price and product advertising, on the one hand, and ideological communication on the other." *Virginia State Board of Pharmacy*, 425 U.S. at 779, 96 S.Ct. at 1834 (Stewart, J., concurring).

Recommendation of particular securities is somewhat dissimilar from "[i]deological expression, be it oral, literary, pictorial, or theatrical, [that] is integrally related to the exposition of thought—thought that may

shape our concepts of the whole universe of man." *Id.* But there is no clearly defined perimeter that circumscribes the universe of ideological thought. Economic discussion addresses issues of public concern and qualifies as ideological debate. *See, e.g.,* P.A. Samuelson, Economics, *passim* (11th ed. 1980) (particularly chapter 42, "Winds of Change: Evolution of Economic Doctrine"); A. Alchian & W.R. Allen, Exchange and Production: Competition, Coordination and Control, Preface (2d ed. 1977); H.G. Manne, The Economics of Legal Relationships 1–3 (1975). The state of the nation's economy and finances is often an issue uppermost in the minds of voters, and politicians regularly point to the performance of the stock market as an index of public confidence in their office. There exists, moreover, no sharp demarcation in the range of economic observation that runs from comment on economic policy to prediction of the performance and recommendation of specific securities. Financial news and analysis is persistently flavored with projected consequences of political events and both may form the predicate for particular investment advice.

The content of the Lowe Investment and Financial Letter illustrates these points. In a typical issue, dated December 11, 1981, the publisher combines factual observations and speculative predictions on market behavior with recommendations on specific securities. The publisher also offers general comments and specific recommendations on the gold and silver markets. Among the observations prefacing advice on bullion investment is a prediction of "increased inflation, worldwide economic havoc, and greatly increased worldwide political turmoil; and in fact, even a world war or major war somewhere . . . which will be fuel in gold's price rise." *Id.* at 7. Attempting to precipitate out the various types of speech present in this mixture is an exercise of doubtful constitutional utility. *See Ad World, Inc. v. Township of Doylestown,* 672 F.2d 1136 (3rd Cir.1982) (tabloid almost entirely devoted to advertising with small amounts of consumer and community information entitled to first amendment protection).

It may be true "that the activities involved in giving commercial investment advice are [not] entitled to the identical constitutional protection provided for certain forms of social, political, or religious expression." *SEC v. Wall Street Transcript Corp.,* 422 F.2d 1371, 1379 (2d Cir.), *cert. denied,* 398 U.S. 958, 90 S.Ct. 2170, 26 L.Ed.2d 542 (1970). "[R]estrictions [that] would clearly violate First Amendment guarantees if applied to political expression concerning the election of candidates to public office" may be permissible with regard to other forms of non-commercial speech. *Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council, Inc.,* 425 U.S. 748, 778 n. 3, 96 S.Ct. 1817, 1833 n. 3, 48 L.Ed.2d 346 (1976) (Stewart, J., concurring) (referring to labor relations). *See Young v. American Mini Theaters, Inc.,* 427 U.S. 50, 70–71, 96 S.Ct. 2440, 2452, 49 L.Ed.2d 310 (1976) (plurality opinion). *Cf.* Note, Peaceful Labor Picketing and the First Amendment, 82 Colum.L.Rev. 1469 (1982). Nevertheless, the combination of fact, economic and political analyses, conjecture, and recommendation characteristic of investment newsletters places them outside the rubric of commercial speech and raises unanswered questions concerning the conditions, if any, under which an absolute restraint may constitutionally be imposed upon them. *Cf. Bantam Books, Inc. v. Sullivan,* 372 U.S. 58, 70, 83 S.Ct. 631, 639, 9 L.Ed.2d 584 (1963) ("Any system of prior restraints of expression comes to this Court bearing a heavy presumption against its constitutional validity").

### C. Construction of Advisers Act

One approach to the constitutional difficulties posed by the SEC's interpretation of the Investment Advisers Act would be to declare the Act unconstitutional as it applies to investment advisory publishers. Such an approach would seriously impede the regulation of securities markets. Its effect on investors as well as those in the securities business might be highly damaging. It seems doubtful that Congress or the SEC would welcome such a result. To the

contrary, Congress has apparently encouraged a flexible approach in the interpretation and execution of the Advisers Act so as to advance the public good. To this end it has provided that

> [t]he Commission, by rules and regulations ... may conditionally or unconditionally exempt ... any class ... of persons ... from any provision [of the Act] ... to the extent that such exemption is necessary or appropriate in the public interest ....

Section 206A of the Advisers Act, 15 U.S.C. § 80b–6a (1976). A similar liberality is called for in the construction of the Advisers Act to preserve its constitutionality and basic design.

Rather than adopt an interpretation that "might collide with the guarantees of the First Amendment," *National Labor Relations Board v. Fruit and Vegetable Packers and Warehousemen, Local 760 (Tree Fruits),* 377 U.S. 58, 63, 84 S.Ct. 1063, 1066, 12 L.Ed.2d 129 (1964), the Act should be construed to steer clear of possible infringements on freedom of the press. As the Supreme Court has recently reminded us,

> We consider the statutory question because of the " 'cardinal principle that this Court will first ascertain whether a construction of the statute is fairly possible by which the constitutional question may be avoided.' " *Lorillard v. Pons,* 434 U.S. 575, 577 [98 S.Ct. 866, 868, 55 L.Ed.2d 40] (1978), *quoting Crowell v. Benson,* 285 U.S. 22, 62 [52 S.Ct. 285, 296, 76 L.Ed. 598] (1932).

*United States v. Security Industrial Bank,* ⸺ U.S. ⸺, ⸺, 103 S.Ct. 407, 412, 74 L.Ed.2d 235 (1982). *See, e.g., United States v. Security Industrial Bank,* (giving a prospective reach to certain provisions of the Bankruptcy Act to avoid questions under the fifth amendment takings clause); *Lorillard v. Pons,* (reading the Age Discrimination in Employment Act to permit jury trial on actions for lost wages rather than reach a seventh amendment challenge); *Tree Fruits* (permitting secondary consumer picketing under the National Labor Relations Act); *National Labor Relations Board*

*v. Catholic Bishop of Chicago,* 440 U.S. 490, 99 S.Ct. 1313, 59 L.Ed.2d 533 (1979) (interpreting the National Labor Relations Act as not granting the National Labor Relations Board jurisdiction over lay faculty members of church-operated schools).

Such concerns did not control in *Savage v. Commodity Futures Trading Commission,* 548 F.2d 192 (7th Cir.1977), a case presenting a strong analogy to the one before us. The Commodity Futures Trading Commission had denied plaintiff's application for registration as a "commodity trading advisor," pursuant to 7 U.S.C. §§ 6n, 12a (1976), because of his prior conviction for securities and mail fraud. Like its counterpart in the Advisers Act, the Commodity Futures Trading Commission Act defines an advisor to include one "who for compensation and profit, and as part of a regular business, issues or promulgates analyses or reports concerning commodities." 7 U.S.C. § 2 (1976). Prior to the enactment of the Act, the plaintiff had published a weekly subscription newsletter giving his views on the commodity market. He challenged the Commission's denial of his registration as a violation of his first amendment rights. The Seventh Circuit panel brushed aside the first amendment challenge, categorizing the speech as commercial and declaring that the first amendment "does not remove a business engaged in communication of information from general laws regulating business practices," 548 F.2d at 197. The court made reference to Justice Harlan's plurality opinion in *Curtis Publishing Co. v. Butts,* 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967), that adduced the securities laws as one example of the proposition that "the right to communicate information of public interest is not 'unconditional'." *Id.* at 150, 87 S.Ct. at 1989.

The *Savage* court did not have the benefit of the Supreme Court's subsequent commercial speech cases suggesting that the commercial speech doctrine is limited to advertising. The cited observations of Justice Harlan in *Curtis Publishing* must be considered in context. The question in that case was not one of prior restraint, but

rather of news media liability in damages for inaccurate and defamatory reporting. Federal securities regulation was referred to in a list that included mail fraud and common-law actions of deceit and misrepresentation. Justice Harlan demonstrated that the law countenanced the imposition of liability and sanctions on those who had disseminated to the public damagingly false information. He did not imply that in a business context the government may restrict in advance the public speech of certain individuals out of a fear that what they would say in the future might prove deceptive. The authority to impose blanket suppression through prior restraint on would-be publishers of impersonal market information thus has not, so far as we have been able to determine, been recognized by the Supreme Court.

The Advisers Act may readily accommodate the principle that "even though the governmental purpose be legitimate and substantial, that purpose cannot be pursued by means that broadly stifle fundamental personal liberties when the end can be more narrowly achieved." *Shelton v. Tucker,* 364 U.S. 479, 488, 81 S.Ct. 247, 252, 5 L.Ed.2d 231 (1960) (footnote omitted). The narrower means provided for in the Act to protect the public against placing its confidence in investment publishers unworthy of its trust is detailed and particular disclosure. *Cf. Citizens Against Rent Control v. City of Berkeley,* 454 U.S. 290, 299, 102 S.Ct. 434, 439, 70 L.Ed.2d 492 (1982) (instead of a limitation on campaign contributions which restrains first amendment freedoms of association and expression "[t]he integrity of the political system will be adequately protected" by public disclosure of contributions).

1. *Denial of Registration to Publishers*

[redacted] The Act is construed to require registration of publishers of impersonal investment material, but is not interpreted to empower the Commission to deny registration to such publishers, qua publishers, nor to revoke their registration previously granted. As the Second Circuit observed in *SEC v. Wall Street Transcript Corp.,* 422 F.2d 1371, 1380 n. 13 (2d Cir.), *cert. denied,* 398 U.S. 958, 90 S.Ct. 2170, 26 L.Ed.2d 542 (1970), "even if a newspaper is engaged in commercial practices which may be regulated, the Act grants no authority for review or censorship by the Commission of investment advisory material prior to its publication."

[redacted] Section 202(a)(11) of the Act, 15 U.S.C. § 80b–2(a)(11) (1976) combines in its definition both the personal and impersonal adviser. Nevertheless, the Act is of limited applicability to advisers and their associates as publishers of impersonal investment advice for general or subscription distribution in section 203(c)(2)(B), 15 U.S.C. § 80b–3(c)(2)(B), insofar as it speaks of denial of registration; the last sentence of section 203(c)(2), 15 U.S.C. § 80b–3(c)(2); section 203(e), 15 U.S.C. § 80b–3(e), insofar as it speaks of suspension or revocation of registration; and section 203(f), 15 U.S.C. § 80b–3(f), insofar as it speaks of suspension or bar from association with an investment adviser. These provisions may only be invoked for failure to make the required disclosures. When a publisher who has been denied registration or against whom sanctions have been invoked fully complies with the record, reporting and disclosure requirements under the Act, he must be allowed to register for the purpose of publishing and to publish.

[redacted] The defendants, whose registration has been revoked by the SEC for all purposes on May 11, 1981, cannot be cited for or enjoined from a violation of the registration provisions of the Advisers Act insofar as their activities are limited to publishing. So long as the defendants stand ready to submit to registration and provide all information that is now or may in the future be properly required by the SEC pursuant to sections 203(c)(1) and 204 of the Advisers Act, 15 U.S.C. §§ 80b–3(c)(1), 80b–4 (1976), but are denied registration by the Commission, they may continue to publish their market newsletters and news services.

In the publisher's context, registration constitutes no more than a feature of the

disclosure mechanism. Although section 203(c)(2) of the Act, 15 U.S.C. § 80b–3(c)(2) (1976), allows the Commission 45 days to make a determination on an application for registration, with an extension of up to 90 days if proceedings are held, this does not constitute an impermissible period of restraint. Unlike certain types of political speech where the timing of public dissemination may be of the essence, *cf. Greenberg v. Bolger,* 497 F.Supp. 756 (E.D.N.Y.1980), the date on which an investment publisher begins to offer his services to the public is not critical. Provided the Commission uses the allowed time in good faith to expeditiously ascertain the completeness and accuracy of the proffered disclosure, the attendant delay is justified by the substantial public interest served by truthful and honest reporting by investment advisers. *See* L. Tribe, Constitutional Law 730–31 (1978).

### 2. *Failure to Reveal Denial of Registration and Convictions*

The SEC charges defendants with a violation of the anti-fraud provisions of the Advisers Act, section 206, 15 U.S.C. § 80b–6 (1976). The contention is that the defendants' solicitation and sale of investment advisory publications without disclosure to readers and potential readers of the SEC's May 11, 1981 order against Lowe and Lowe Management Corporation and Lowe's criminal convictions constituted fraud.

■ The SEC's authority to require of investment advisers on-going disclosure derives from section 204 of the Advisers Act, 15 U.S.C. § 80b–4 (1976). This section does not authorize the SEC to prescribe ad hoc disclosure requirements. Section 204 explicitly provides that any record and report obligation imposed by the SEC must be prescribed by rule; disclosure requirements must be of general application. Because there is no rule presently in force that would require a subscription market letter publisher to disclose to its readers the past misconduct or criminality of its owners, employees or associates, the defendants cannot be found to have violated any reporting requirements. Advisers Act Rule 204–3, 17 C.F.R. § 275.204–3 (1982), which requires

certain disclosure to advisory clients, conspicuously fails to require disclosure of Part I of Form ADV, containing a recital of any administrative or judicial determinations of misconduct against the adviser. It would be patently unfair to hold defendants accountable under the anti-fraud provisions of section 206 for failure to disclose when the reporting rules are silent on any such requirement and may even imply the absence of such a requirement.

Nothing presented to the court in this case suggests that narrowly drawn reasonable rules for divulgence in the publication itself of criminal activities or of deregistration of principals of a publisher would be invalid. The "fact that a demand for disclosure may have some deterrent effect upon speech does not automatically invalidate it." *SEC v. Wall Street Transcript Corp.,* 422 F.2d 1371, 1380 (2d Cir.), *cert. denied,* 398 U.S. 958, 90 S.Ct. 2170, 26 L.Ed.2d 542 (1970). *See Lewis Publishing Co. v. Morgan,* 229 U.S. 288, 33 S.Ct. 867, 57 L.Ed. 1190 (1913) (validating legislation now contained in 39 U.S.C. § 3685 (1976), requiring a periodical publication having reduced rate mailing privileges to publish annually the identities of its owners, editors, publishers and creditors). *See also Talley v. California,* 362 U.S. 60, 80 S.Ct. 536, 4 L.Ed.2d 559 (1960) (ordinance requiring publicly distributed handbills to contain a printed identification of authorship not narrowly drawn to effect the declared aims, so that the Court was not required to reach the question of whether such a disclosure requirement could ever be constitutional); L. Tribe, Constitutional Law 798–99 (1978). *Cf. Electric Bond and Share Co. v. SEC,* 303 U.S. 419, 58 S.Ct. 678, 82 L.Ed. 936 (1938) (upholding the registration and disclosure provisions of the Public Utility Holding Company Act of 1935, 15 U.S.C. §§ 79 *et seq.* (1976)); *Oklahoma-Texas Trust v. SEC,* 100 F.2d 888 (10th Cir.1939) (ruling that Congress may require securities registration as a condition precedent to the use of the mails and the facilities of interstate commerce); *Buckley v. Valeo,* 424 U.S. 1, 60–85, 96 S.Ct. 612, 654–66, 46 L.Ed.2d 659 (1976) (approving the reporting and disclosure re-

quirements of the Federal Election Campaign Act, 2 U.S.C. §§ 431 *et seq.* (1976)); *United States v. Harriss,* 347 U.S. 612, 74 S.Ct. 808, 98 L.Ed. 989 (1954) (upholding the reporting provisions of the Federal Regulation of Lobbying Act, 2 U.S.C. §§ 261 *et seq.* (1976), against first amendment challenge). The government has an added interest in publicly disseminated disclosure when speakers avail themselves of the mails as do investment advisory publishers. *See Lewis Publishing Co. v. Morgan, supra.* This interest is expressed on the face of section 204 of the Advisers Act, 15 U.S.C. § 80b–4 (1976), which imposes record and reporting obligations on "[e]very investment adviser *who makes use of the mails* or of any means or instrumentality of interstate commerce." (Emphasis added.)

### Conclusion

The Advisers Act requires registration of investment advisory publishers. It does not authorize denial of registration to these persons as publishers because of past misconduct so long as they make the disclosure provided for in the Act and rules. Because the defendants in this case were effectively denied registration as publishers, they will not be enjoined from publishing their newsletters and other impersonal services. The Commission's order of May 11, 1981 remains undisturbed insofar as it applies to any investment advisory activity other than the publication of impersonal investment advisory material.

The offer of defendants to their subscribers to provide current information by telephone goes beyond impersonal communication. It creates dangers of personal advice. The SEC may reasonably deny this right to publishers barred from giving personal advice.

Defendants did not violate the anti-fraud provisions of the Advisers Act by failing to disclose to their subscribers Lowe's criminal convictions and the Commission's order of May 11, 1981 revoking the registration of Lowe Management Corporation and barring Lowe from association with any investment adviser. There presently exists no obliga-

tion under the securities laws and rules to make such disclosure.

The petition for a temporary and permanent injunction pursuant to section 209(e) of the Advisers Act, 15 U.S.C. § 80b–9(e) (1976), and the petition for an equitable order of disgorgement of monies received in the course of the business of impersonal investment advisory publication are denied. An injunction will issue denying defendants permission to give securities information to their subscribers or potential subscribers directly or indirectly by telephone, individual letter or in person.

So ordered.