THE ENTERPRISE, INC., Petitioner,

v.

The UNITED STATES of America,
United States Postal Service,
Respondents,

Association of Business Publishers; the
Magazine Publishers Association; the
American Newspaper Publishers Asso-
ciation; and National Newspaper Asso-
ciation, Intervenors–Respondents.

No. 86–3919.

United States Court of Appeals,
Sixth Circuit.

Argued Aug. 20, 1987.

Decided Nov. 24, 1987.

Buddy D. Perry, argued, Winchester,
Tenn., David A. Marlowe, for petitioner.

Frances G. Beck, Assoc. Gen. Counsel,
Office of Rate & Classification Law, Wash-

ington, D.C., Stanley F. Mires, Assoc. Gen. Counsel, Rate Application Div., Washington, D.C., Robert V. Zener, argued, Appellate Staff, Civ. Div., Dept. of Justice, Washington, D.C., for respondents.

Stephen M. Feldman, Wyatt & Saltzstein, Publishers, Washington, D.C., Robert A. Saltzstein, for Assoc. of Business Publishers.

David Minton, Washington, D.C., for Magazine Pub. Assoc.

Robert J. Brinkman, Gen. Counsel, Washington, D.C., for National Newspaper Assoc.

W. Terry Maguire, Tonda F. Rush, Washington, D.C., for American Newspapers Publishers Assoc.

Before GUY and BOGGS, Circuit Judges; and SUHRHEINRICH, District Judge.*

RALPH B. GUY, Jr., Circuit Judge.

This appeal presents the question of whether the United States Postal Service's (USPS) "paid-subscriber rule," compliance with which allows a publisher to qualify for more favorable second-class mailing rates, violates the first and fifth amendments to the Constitution. Because we agree with the conclusion of the Postal Service's Board of Governors that it does not, its decision will be affirmed.

## I. Procedural History

Initially, the petitioner, The Enterprise, Inc. (Enterprise), publisher of a free publication mailed without request to over 18,000 homes in several rural counties in Tennessee, filed suit in federal district court challenging the constitutionality of two USPS regulations (commonly known as the paid subscriber rule) which set eligibility requirements for subsidized second-class mailing privileges. The District Court for the Eastern District of Tennessee upheld the Enterprise's constitutional challenge and ordered that the Enterprise be granted second-class mailing privileges. *The En-*

*terprise, Inc. v. Bolger,* 582 F.Supp. 228 (E.D.Tenn.1984). On appeal by the Postal Service, this court vacated the judgment of the district court on the ground that 39 U.S.C. § 3628 mandated that petitioner's challenge be first pursued through administrative channels. *The Enterprise, Inc. v. Bolger,* 774 F.2d 159, 161 (6th Cir.1985) (Enterprise I). Upon review of the legislative history of the Postal Reorganization Act of 1970, 39 U.S.C. §§ 101–5605, we held that even constitutional questions must be raised initially at the agency level and that direct review of the agency's ruling was properly sought only in the court of appeals. *Id. See* 39 U.S.C. § 3628 ("A decision of the Governors to approve, allow under protest, or modify the recommended decision of the Postal Rate Commission may be appealed to any court of appeals of the United States ...").

## II. Administrative Proceedings

Following dismissal, the Enterprise pursued its claims before the Postal Rate Commission (PRC), an independent executive body charged with recommending appropriate postal rates, fees, and mail classifications to the USPS Board of Governors. *See generally* 39 U.S.C. §§ 3601–3625. The PRC acts as a factfinding body and, as such, is required to extend an opportunity for a full hearing to all involved parties prior to issuing its recommended decision. 39 U.S.C. § 3624. The Board of Governors retains final authority to approve, reject, or modify a PRC recommendation. 39 U.S.C. § 3625.

The case was submitted to the PRC on stipulated facts, which were that the Enterprise is a weekly newspaper and is mailed free of charge to approximately 18,000 homes in several rural counties in Tennessee. Prior to initiating these proceedings, the Enterprise was mailed at third-class bulk rates. Its publisher was told by the local postmaster that an application for second-class rates would be futile since the publication is mailed free of charge to its

---

* Honorable Richard F. Suhrheinrich, United States District Court, Eastern District of Michigan, sitting by designation.

recipients without request. One of the requirements for a publication's entry to second-class mail status is that it have a "legitimate list of subscribers." This requirement has been refined and clarified in postal regulations as requiring that over fifty percent (50%) of the copies of a periodical be sent to persons paying or promising to pay at a rate above nominal for a stated period of time. Second-class rates are generally available for periodical publications meeting this and other requirements. The rate is complex, varying by weight, destination, level of presortation, and proportion of nonadvertising matter. In general, for most publications, the second-class rate is less costly than alternative first and third-class rates.

Throughout its history, second-class rates have been subsidized. Since the Postal Reorganization Act of 1970, this subsidy is being phased out, but it remains in effect for certain limited categories, including publications mailed for delivery within the county of publication. However, even for publications not qualifying for this "in-county" subsidy, the second-class rate is typically more favorable than first or third class.

In the PRC proceedings, the Enterprise adopted the legal arguments contained in the brief of an earlier filed and nearly identical case, *Tri–Parish Journal, Inc.*, No. C85–2. Therefore, several of the Enterprise's arguments were most fully addressed in the PRC's recommended decision in the *Tri–Parish* case, and that decision was referenced frequently by the PRC in its decision in the case at bar. The PRC found the applicable first amendment law to require that the challenged regulations be content neutral, narrowly tailored to serve a significant governmental interest, and leave open alternative channels of communication. Since no question had been raised as to the regulations' content neutrality, the PRC assessed the availability of alternative channels of communication and found that the use of third-class or an alternate second-class "requester" status (whereby second-class status is conferred by virtue of fifty percent (50%) or more of a periodical's copies being requested by its

recipients, despite the fact that the publication is free) satisfied the criteria. The PRC also concluded that, although neither of these options would permit it the preferred in-county rates, the Enterprise did not have a constitutional right to government "subsidies." Finally, with respect to the presence of a significant governmental interest, the PRC found that the valid governmental purpose here was to restrict the advantageous second-class rate to informational publications objectively demonstrated to be of value to the recipient. Since review of the legislative history of the second-class revealed that other mechanisms had proved unsuccessful in restricting publications to those containing primarily public information as opposed to advertising, the PRC found that the paid-subscriber rule functioned effectively as the least restrictive means of achieving second-class objectives.

In its recommended decision, the PRC also considered the Enterprise's contention that it should receive a second-class subsidy because it is a newspaper:

> In [*Tri–Parish*], we discussed the concern of the parties that "newspaperness" is insufficient as a measure of the "worthiness" of a publication for eligibility to second-class. For instance, in *Tri–Parish*, the parties had competing views on whether that publication qualified as a legitimate newspaper, based on testimony about issues such as the proportion of advertising content and the editorial and management practices of *Tri–Parish*. The debate among the parties highlighted, in our view, the difficulties with such a largely subjective standard. Even though we do not have similar testimony about the practices and/or content of *The Enterprise*, our prior conclusion that the quality of being a "newspaper" fails to provide a meaningful criterion for second-class eligibility, is just as appropriate here.

The Commission concluded:

> [T]he paid subscriber rule [is] an "objective" standard which avoids assessments of quality by Postal Service personnel and thereby complies with the Constitution: "[The current rule] avoids the need

for judging motives, and addresses the objectively demonstrated desires of the public, as shown in willingness to purchase, or request, any particular publication." *Tri–Parish*, PRC Op. C85–2 at ¶ 510. This reasoning also is applicable to this case, and we reaffirm our conclusion in *Tri–Parish* that "newspaperness" is inadequate for assessing second-class eligibility.

In *Tri–Parish*, the Board of Governors had approved the PRC's recommended decision, commenting that Tri–Parish's suggested alternative to the paid-subscriber rule—that a board of journalism experts be set up to review second-class mailing permit applications and approve those which the board found to be submitted by legitimate "newspapers"—would present considerably more substantial first amendment problems, since it would necessarily involve subjective, content-based determinations. Since the Enterprise had not presented any new arguments in support of its position, aside from the fact that its status as a bona fide "newspaper" was not contested, the Board approved the PRC's recommendation to retain the paid-subscriber rule and thereby continue the use of an objective test for determining a publication's value to the consuming public as a prerequisite for enjoyment of second-class mailing privileges.

### III. Origin and History of the Paid Subscriber Rule

The paid-circulation requirement was first established by Congress in 1879. In that year, Congress repealed all laws relating to the classification of mail matter and established a comprehensive postal classification system. The Act of March 3, 1879, ch. 180, § 7, 20 Stat. 355, divided all mailable matter into four classes: written matter, periodical publications, miscellaneous printed matter, and merchandise. The purpose of the second-class mail matter (periodical publications) was to facilitate the "dissemination of information of a public character." Act of March 3, 1879, ch. 180, § 14, 20 Stat. 355.

Section 14 of the statute established four requirements for mail matter of the second class. The "Fourth Condition" was that a publication

> must be originated and published for the dissemination of information of a public character, or devoted to literature, the sciences, arts, or some special industry, and having a legitimate list of subscribers; provided, however, that nothing herein contained shall be so construed as to admit to the second class rate regular publications, designed primarily for advertising purposes, or for free circulation, or for circulation at nominal rates.

*Id.* In contrast to the explicit requirements for second-class entry, section 17 of the statute declared that third-class matter would "embrace books, transient newspapers, and periodicals, circulars, and other matter wholly in print...." Congress thus differentiated between second-class publications, distributed in response to subscriber demand at the bargain rate of two cents per pound, and all other printed matter, including advertising circulars, which were then carried at the rate of one cent for each two ounces. See sections 11 and 17 of the Act of 1879.

The purpose of the Fourth Condition for second-class entry was to reserve favorable second-class postage rates to periodicals designed for the dissemination of public information in response to reader demand, but to refuse those rates to other printed matter generally circulated free and devoted to the furtherance of commercial advertising. Thus, when the pertinent language was first debated in the Senate as an amendment to a bill establishing post roads, Senator Ferry, the bill's manager, explained that previous efforts had failed to separate legitimate periodicals from advertising publications:

> The law of 1876 [Act of July 12, 1876, ch. 179, § 5, 19 Stat. 82] subdivided class 2 for the purpose of attempting to prevent the transportation in the second class of third-class matter; but it was found that under this law it could not be prohibited. We are now losing at the rate of about half a million a year by the transportation of periodicals, as they are claimed to

be, but issued for advertising purposes, for individual interests.

*See* 7 Cong.Rec. 4025–27 (1878).

The Senate amendment to the post roads bill was not adopted by the House in 1878 but, in the following year, the House Committee on the Post Office and Post Roads reported the same provisions in a separate bill. Again, the supporters of the bill attacked the use of public funds to subsidize advertising. In joining with the Chairman of the Post Office Committee to block an amendment which would have softened the advertising restrictions and paid subscriber requirements, Congressman Money summarized the prevailing sentiments:

> Well, the design of this bill is to exclude from the privileged rates such matter as that, because no honest business man ought to come before Congress and ask the Government to circulate advertisements at a rate which everybody knows is a dead loss to the Government.

*See* 8 Cong.Rec. 697 (1879).

House action on the bill was slowed by controversial provisions requiring the annual registration of publications. To speed consideration of the bill in the House, the Senate attached it to the post office appropriations bill. *See* 8 Cong.Rec. 1662–1665 (1879). The House, however, did not disturb the bill's careful distinction between second and third-class mail matter on the basis of the circulation criteria contained in the Fourth Condition of section 14. Congressman Money, a leading supporter of the Fourth Condition, explained its purpose:

> It does keep from the mails a vast bulk of matter which would go at the privi-

leged rate, and which is made up simply of advertising concerns not intended for public education. We know the reason for which papers are allowed to go at a low rate of postage, amounting almost to the franking privilege, is because they are the most efficient educators of our people. It is because they go into general circulation and are intended for the prosperity and the best interests of the people all over the country. Then all this vast mass of matter is excluded from that low rate of postage. I say, instead of being a censorship upon the press, it is for the protection of the legitimate journals of the country.

*See* 8 Cong.Rec. 2135 (1879).

Thus, to distinguish between second-class publications and third-class printed matter, Congress settled upon objective criteria such as the evidence of public demand shown by a publication's subscriber list and paid circulation. At the same time, it chose not to entrust the registration of publications to the judgment of postal officials. The deletion of the annual registration requirement from the Act of March 3, 1879, reflected fears of placing unchecked power in the hands of postal officials and of multiplying the ranks of the federal bureaucracy. *See* remarks of Representatives Cannon, Blunt, and Springer, 8 Cong.Rec. 2135–2137 (1879).[1] In contrast, Congress viewed the paid subscriber requirement and the prohibition against free circulation in the Fourth Condition of section 14 as an objective method of distinguishing second-class publications from other printed matter on a basis that would not permit government censorship.[2]

---

1. Congressman Springer pointed out that in many instances the local postmaster also edited or published a local newspaper which expressed the views of his political party, and the proposed registration requirement would allow him to censor any rival paper of the opposing party. 8 Cong.Rec. 2137 (1879).

2. Two subsequent congressional commissions were established to study some of the continuing problems associated with second-class mail. The first, the Penrose–Overstreet Commission, appointed in 1906, found permanent value in the ideas embodied in the Fourth Condition of section 14, expressed as follows:

> First. That the class of objects intended to be given the second-class privilege are instrumentalities for the dissemination of the current knowledge of the world, whether relating to public affairs, literature, art, or science.
>
> Second. That in order to get the benefit of this special rate this instrumentality must exist in response to a general public demand.
>
> Third. That the instrumentality of public enlightenment so privileged shall not be perverted to a commercial purpose.
>
> While no one, perhaps, of these ideas is explicitly expressed in the statute, they are all involved, so to speak, in its texture.

In 1960, as part of the first general recodification of the postal statutes since 1872, Congress retained the paid-subscriber requirement and the ban on free circulation as conditions for second-class status. *See* former 39 U.S.C. § 4354(a)(5), (c), codified by Pub.L. No. 86–682, 74 Stat. 666 (1960). Thereafter, as a result of the Postal Reorganization Act of 1970, Pub.L. No. 91–375, 84 Stat. 719 (1970), the Postal Service became "an independent establishment of the executive branch of the Government of the United States." 39 U.S.C. § 201. In that Act, Congress delegated its ratemaking and classification authority to the Governors of the Postal Service, and created the PRC to review proposed rate and classification changes and to make recommendations to the Board of Governors. 39 U.S.C. §§ 3601, 3621–25. The purpose of these changes was to remove Congress from the ratemaking and classification process and to establish rates and classifications "on the basis of expert consideration of the overall value of the service provided and the allocation of costs on a scientific or quasi-scientific basis." *See* S.Rep. No. 912, 91st Cong., 2d Sess. 11 (1970).

Congress delegated to the Board of Governors broad authority to establish mail classifications (see 39 U.S.C. § 3621, requiring that classifications be "reasonable and equitable") and likewise gave the PRC broad discretion to recommend classes of mail (see 39 U.S.C. § 3623(c)(1), charging the PRC with the "establishment and maintenance of a fair and equitable classification system for all mail"). For one important purpose, however, Congress required the USPS and the PRC to preserve the statutory eligibility requirements for subsidized second-class rates originally established in 1879. The Act directs special subsidized treatment for "publications admitted as second-class mail" when mailed for delivery "within the county in which they are published and entered." *See* former 39 U.S.C. § 4358(a), (b). After a prescribed period of time, the 1970 Act directs that the revenues received from rates for § 4358 mail shall not "exceed the direct and indirect postal costs attributable to mail of such class or ·kind (excluding all other costs of the Postal Service)." 39 U.S.C. § 3626(a)(1). The revenues foregone by reason of this provision are replaced by an annual appropriation authorized by 39 U.S.C. § 2401(c). This special provision essentially exempts mail under former § 4358 (i.e., in-county second-class mail) from paying its share of the overhead costs of the Postal Service as long as Congress appropriates sufficient funds.[3]

The requirement that section 4358 second-class publications continue to be entered as second-class mail must be read in conjunction with former 39 U.S.C. § 4354, which provided the conditions for general second-class entry in these terms:

(a) Generally a mailable periodical publication is entitled to be entered and mailed as second class mail if it

*See* H.R.Doc. No. 608, *Report of the Postal Commission Authorized by Congress to Make Inquiry Regarding Second–Class Mail Matter,* 59th Cong., 2d Sess., xxxviii (1907). The Commission found, however, that this salutary purpose had been undermined by publishers who used subscription premiums and combination offers as inducements to subscribers. To remedy this problem, the Commission proposed stricter enforcement of the paid-subscriber rule, noting that this action would generally eliminate the difficult and subjective determination of whether a publication was "primarily designed for advertising purposes."

The second Commission, established in 1912, also warned against basing second-class eligibility on subjective decisions about the character of a publication:

The low rate has helped to stimulate an enormous mass of periodicals, many of which are of little utility for the cause of popular education. Others are of excellent quality, but the experience of the post office has shown the impossibility of making a satisfactory test based upon literary or educational values. To attempt to do so would be to set up a censorship of the press.... A "legitimate list of subscribers" has been insisted upon as an indication that a periodical is desired by the public....

*See* H.R.Doc. No. 559, *Message of the President, Transmitting the Annual Report of the Postmaster General for the Fiscal Year Ended June 30, 1911, and the Report of the Commission on Second–Class Mail Matter,* 62d Cong., 2d Sess., 142–43 (1912).

**3.** Congress has appropriated money to subsidize this category of mail each year since 1970.

....

(5) has a legitimate list of subscribers.

....

(c) A periodical publication designed primarily for advertising purposes or for free circulation or for circulation at nominal rates is not entitled to be admitted as second class mail under this section.

Thus, Congress directed the PRC and the Postal Service to maintain the in-county subsidy for second-class mail as defined by the statute in effect prior to 1970 and that definition included the requirement of a legitimate list of subscribers and the restriction on free circulation. Accordingly, the paid-subscriber rule remains in significant degree a statutory requirement for eligibility for the subsidized, in-county rate, despite the broad ratemaking discretion conferred on the PRC and the USPS by the 1970 Postal Reorganization Act.

## IV. The Implementing Regulations

The classification decisions of the Board of Governors have recognized the Congressional requirement to preserve the second-class subsidized category as defined by statute prior to 1970. The current mail classification system is compiled in the Domestic Mail Classification Schedule (DMCS). *See* 39 C.F.R. § 3001.68, Appendix A to Subpart C (1986). The detailed regulations which implement the DMCS are set forth in the Domestic Mail Manual (DMM), a publication incorporated by reference in 39 C.F.R. § 111.1 (1986). The DMCS and the related provisions of the DMM still retain the general outline of the classification system established by Congress in 1879. Specifically, the DMCS states:

200.0105 Second-class matter must have a legitimate list of persons who have subscribed by paying or promising to pay at a rate above a nominal rate for copies to be received during a stated time....

....

200.012 Publications designed primarily for advertising purposes, free circulation, or circulation at nominal rates ... do not qualify for second-class privileges....

....

200.0122 Designed primarily for free circulation is defined as distribution of 50 percent or more of the copies of a publication for free or at a nominal rate. Copies mailed to persons who are not on a legitimate list of subscribers ... are free copies.

The Domestic Mail Manual regulations at issue in this proceeding are based on, and reflect, the language of the DMCS. In pertinent part, DMM § 422.221 states the paid subscriber requirement of DMCS § 200.0105:

General publications must have a legitimate list of subscribers who have paid or promised to pay, at a rate above a nominal rate, for copies to be received during a stated time....

Similarly, DMM § 422.223 excludes free publications from general second-class entry, echoing DMCS §§ 200.012 and 200.-0122:

Publications primarily designed for free circulation and/or circulation at nominal rates may not qualify for the general publications category. Publications are considered primarily designed for free circulation and/or circulation at nominal rates when one-half or more of all copies circulated are provided free of charge ... or are paid for at nominal rates by the ultimate recipients....

These eligibility standards for general second-class publications follow the approach adopted by Congress in the 1879 postal legislation and maintained continuously for the following ninety years. The PRC and the Board of Governors, like Congress, have selected objective evidence of customer demand rather than the more subjective standard of "newspaperness" as the primary distinguishing characteristic of second-class mail. The objective evidence of a list of paid subscribers has been chosen as the most useful tool, consistent with the desire to avoid postal censorship, to distinguish between second-class publications issued in response to reader demand and third-class matter primarily designed for the advertising or other commercial purposes of the publisher.

## V. The Validity of the Paid Subscriber Rule

The Enterprise advances two arguments on appeal, both of which were raised and decided adversely to them in the administrative proceedings:

(1) the USPS's regulatory scheme is not a rational method under the first amendment of accomplishing the legislative purpose of favoring publications disseminating information in the public interest; and

(2) the applicable regulations unduly burden legitimate newspapers under the equal protection clause of the fifth amendment.[4]

### A. The First Amendment Challenge

■ While "the government has no power to restrict expression because of its message, its ideas, its subject matter, or its content," *Police Department of Chicago v. Mosely*, 408 U.S. 92, 95, 92 S.Ct. 2286, 2290, 33 L.Ed.2d 212 (1972), it has been recognized that, as the institution of the press has evolved into large publishing empires, it has been legitimately subjected to "extensive regulatory legislation." *Pittsburgh Press Co. v. Human Relations Commission*, 413 U.S. 376, 382–83, 93 S.Ct. 2553, 2557, 37 L.Ed.2d 669 (1973). Expression, whether oral or written, may be subject to reasonable time, place, and manner restrictions. *Clark v. Community for Creative Non–Violence*, 468 U.S. 288, 293, 104 S.Ct. 3065, 3068–69, 82 L.Ed.2d 221 (1984). Such restrictions are valid "provided that they are justified without reference to the content of the regulated speech, that they are narrowly tailored to serve a significant governmental interest, and that they leave open ample alternative channels for communication of the information." *Id.* *Accord Members of the City Council v. Taxpayers for Vincent*, 466 U.S. 789, 807, 104 S.Ct. 2118, 2130, 80 L.Ed.2d 772 (1984); *see also Wheeler v. Commissioner of Highways*, 822 F.2d 586 (6th Cir.1987) (upholding provisions of the Kentucky Billboard Act against first and fourteenth amendment challenges). We find that the paid-subscriber rule meets this three-part test.

The federal courts have sustained the broad authority of the Post Office to establish content-neutral standards for favorable second-class mailing rates. In *Lewis Publishing Co. v. Morgan*, 229 U.S. 288, 33 S.Ct. 867, 57 L.Ed. 1190 (1913), the Supreme Court considered a challenge to the statutory requirement that each publisher of a second-class publication file and publish an annual statement of ownership and paid circulation and mark all paid editorial matter as an advertisement. The Court found these requirements helped to achieve the Congressional intent to promote the dissemination of knowledge by second-class mail by providing the public with "the names not only of the apparent, but of what might prove to be the real and substantial owners of the publications," and by enabling the public "to know whether matter which was published was what it purported to be or was in substance a paid advertisement." *Id.* at 316, 33 S.Ct. at 875.

The Court left no doubt regarding the authority of Congress to establish favorable rates for second-class publications and to condition second-class entry on the standards contained in section 14 of the Act of March 3, 1879 (which included the paid subscriber standard):

While it cannot be questioned that the conferring of the special privileges above stated were at least in form a discrimination against the public generally, beyond doubt, however, in the legislative mind they were deemed not to be of that character because the purpose of their bestowal was to secure to the public the benefits to result from "the wide dissemination of intelligence as to current events." Certain, however, as is this view, it is equally also certain that for the purpose of securing the public benefits which it was conceived would result from the giving of the privilege, it was deemed that the power and duty existed to fix a standard which should be com-

---

**4.** There is, of course, no equal protection clause in the fifth amendment, although equal protec- tion arguments are made as a result of the due process clause of the fifth amendment.

plied with by those who wished to enjoy the privilege,—a result manifested by the ... provisions of § 14 of the Act of March 3, 1879, ch. 180, 20 Stat. 355, 359....

229 U.S. at 304–05, 33 S.Ct. at 871. Summarizing the authority of Congress to limit second-class mail subsidies, the Court made it clear that Congress could deny the subsidy to publications designed primarily for advertising purposes:

As the right to consider the character of the publication as an advertising medium was previously deemed to be incidental to the exercise of the power to classify for the purpose of second class mail, it is impossible in reason to perceive why the new condition as to marking matter which is paid for as an advertisement is not equally incidental to the right to classify.

*Id.* at 315, 33 S.Ct. at 875. *See also Lewis Publishing Co. v. Wyman,* 182 F. 13 (8th Cir.1910), *aff'd,* 228 U.S. 610, 33 S.Ct. 599, 57 L.Ed. 989 (1913) (sustaining a regulation which limited the number of free "sample copies" for distribution at second-class rates in order to effectuate the paid-subscriber requirement).

As the PRC noted in its recommended decision in *Tri–Parish Journal, Inc.:*

Almost certainly, there exist persons who would like to receive publications but who cannot afford to subscribe to them. Regardless, the need to define a class of mail for publications requires that a line be drawn somewhere—and that an effort be made to restrict this classification to publications which have been shown to be considered of value by their recipients.

Recommended Opinion at ¶ 511. Both the legislative history of the rule and the substantial testimony received by the PRC in the *Tri–Parish* case make clear the unavoidable difficulty in awarding second-class privileges on the basis of a publication's "worthiness" as demonstrated by its resemblance to a bona fide newspaper. It is true that the motivating force behind the paid-subscriber rule was to deny second-class mailing privileges to those publica-

tions containing mainly advertising or other commercial messages benefitting primarily the publisher. However, conditioning eligibility for second-class status on the subjective newsworthy qualities of a publication or other equally subjective method of assessing the amount of pure editorial/educative material as opposed to commercial/advertising material would result in an impermissible level of content-based decisionmaking. By focusing on the desires of the public, as expressed by their willingness to either subscribe and pay for or formally "request" a publication, the regulatory scheme avoids the thorny alternative of permitting the Postal Service to make those decisions.

■■■■ The Enterprise makes much of the fact that the USPS has admitted that it is a "legitimate" newspaper, which presumably means that its primary purpose is the education/information of the public on public issues, with limited local advertising being secondary to that purpose. It contends that the difficult decisions regarding whether or not a certain publication qualifies as a legitimate newspaper "should be left to another court at another time," since they are not applicable to the case *sub judice.* However, this argument overlooks not only the authority of the USPS but its need to make classification decisions which will apply to literally thousands of differing publications in a relatively simple, expeditious, and content-neutral manner. The first amendment is not violated merely because a content-neutral regulation raises the cost of one avenue of communication, or prevents the use of one mode of communication where others exist. This is especially true where the cost of the desired mode is artificially reduced through government subsidies.

An analogous situation involving Congressional denial of tax-exempt status under 26 U.S.C. § 501(c)(3) to organizations which engage in substantial lobbying activities was addressed in *Regan v. Taxation With Representation (TWR),* 461 U.S. 540, 103 S.Ct. 1997, 76 L.Ed.2d 129 (1983). The Court rejected a claim that the denial of tax-exempt status for this reason violated

the first amendment, emphasizing that the denial of a subsidy places no affirmative burden on the exercise of these rights:

> The Code does not deny TWR the right to receive deductible contributions to support its non-lobbying activity, nor does it deny TWR any independent benefit on account of its intention to lobby. Congress has merely refused to pay for the lobbying out of public monies. This Court has never held that Congress must grant a benefit such as TWR claims here to a person who wishes to exercise a constitutional right.

> ... Congress has not infringed any First Amendment rights or regulated any First Amendment activity. Congress has simply chosen not to pay for TWR's lobbying. We again reject the "notion that First Amendment rights are somehow not fully realized unless they are subsidized by the State."

> . . . .

> These are scarcely novel principles. We have held in several contexts that a legislature's decision not to subsidize the exercise of a fundamental right does not infringe the right, and thus is not subject to strict scrutiny....

> The reasoning of these decisions is simple: "although government may not place obstacles in the path of a [person's] exercise of ... freedom of [speech], it need not remove those not of its own creation. Although TWR does not have as much money as it wants, and thus cannot exercise its freedom of speech as much as it would like, the Constitution "does not confer an entitlement to such funds as may be necessary to realize all the advantages of that freedom."

461 U.S. at 545–46, 549–50, 103 S.Ct. at 2001, 2003 (footnotes and citations omitted) (quoting *Cammarano v. United States*, 358 U.S. 498, 515, 79 S.Ct. 524, 535, 3 L.Ed.2d 462 (1959), and *Harris v. McRae*, 448 U.S. 297, 316, 318, 100 S.Ct. 2671, 2688, 65 L.Ed.2d 784 (1980)). *Cf. Jones v. North Carolina Prisoners' Labor Union, Inc.*, 433 U.S. 119, 130–31, 97 S.Ct. 2532, 2540–41, 53 L.Ed.2d 629 (1977) (denial of bulk mailing privileges to prisoners' union upheld; "it is clear that losing these cost

advantages [of lower bulk mailing rates] does not fundamentally implicate *free speech* values") (emphasis in original).

The governmental interest furthered by the paid-subscriber rule is that of limiting the second-class subsidy to material of demonstrable value to the recipients and not primarily designed for advertising purposes. Congress's decision to subsidize the dissemination of information designed to educate and inform the public, but not that which directly or indirectly serves the financial interests of the publisher, by way of content-neutral regulation has been approved by the federal courts. In *Hannegan v. Esquire*, 327 U.S. 146, 66 S.Ct. 456, 90 L.Ed. 586 (1946), the Supreme Court overturned the revocation of a publisher's second-class privileges where the Postmaster General had ruled that the magazine's contents, although not obscene, did not "contribute to the public good and the public welfare." *Id.* at 149–50, 66 S.Ct. at 458. In so holding, the Court stated, "[w]e may assume that Congress has broad power of classification and need not open second-class mail to publications of all types." *Id.* at 155, 66 S.Ct. at 461. The Court contrasted the disapproved practice of content-based censorship with the implicitly-approved objective standards for second-class entry:

> It is plain ... that the favorable second-class rates were granted periodicals meeting the requirements of the Fourth condition [the basis of the paid subscriber rule], so that the public good might be served through a dissemination of the class of periodicals described. But that is a far cry from assuming the Congress had any idea that each applicant for the second-class rate must convince the Postmaster General that his publication positively contributes to the public good or public welfare.

*Id.* at 157, 66 S.Ct. at 461–62. Numerous other courts have cited, interpreted, or enforced these requirements without question. *See H.W. Wilson Co. v. United States Postal Service*, 580 F.2d 33, 35 (2d Cir.1978), *aff'g* 438 F.Supp. 326, 327 (S.D.N.Y.1977); *Institute for Scientific Informa-*

tion, Inc. v. United States Postal Service, 555 F.2d 128, 130 (3d Cir.1977); Myrick v. United States, 219 F. 1, 4–5 (1st Cir.1915); Sunshine Publishing Co. v. Summerfield, 184 F.Supp. 767, 771–72 (D.D.C.1960). Hence, we find the rule to be sufficiently tailored to accomplish this significant governmental interest.

Finally, mailing privileges have not been denied to the Enterprise by operation of the paid-subscriber rule. The alternatives of third-class bulk rate or the more favorable second-class "requester" status are open to the paper. Because we find that these alternatives constitute ample substitute avenues for communication, we discern no first amendment violation.

B. The Fifth Amendment Challenge

■ Although a regulation implementing a legislative classification generally will be found constitutional if it is rationally related to a legitimate governmental purpose, see Zobel v. Williams, 457 U.S. 55, 60, 102 S.Ct. 2309, 2312–13, 72 L.Ed.2d 672 (1982), a higher level of scrutiny is applicable in cases involving suspect classifications or classifications which burden fundamental rights, see Clements v. Fashing, 457 U.S. 957, 963, 102 S.Ct. 2836, 2843–44, 73 L.Ed. 2d 508 (1982). The Supreme Court has explained that "a legislature's decision not to subsidize the exercise of a fundamental right does not infringe the right, and thus is not subject to strict scrutiny." TWR, 461 U.S. at 549, 103 S.Ct. at 2003. Since we have found the regulations at issue here to be content-neutral and narrowly drawn, strict scrutiny is inapplicable.

The Supreme Court has also recognized that Congress may establish postal categories "with the generality of cases in mind," without making them depend on "all of the variations" that might appear in individual cases. United States Postal Service v. Council of Greenburgh Civic Associations, 453 U.S. 114, 132–33, 101 S.Ct. 2676, 2686–87, 69 L.Ed.2d 517 (1981). The government's interest in an educated public

is undeniable and is served by subsidized in-county second-class rates, 39 U.S.C. § 3626(a)(1), and provisions which direct the PRC to consider the value of mail matter to recipients in its rate and classification decisions, 39 U.S.C. §§ 3622(b)(8), 3623(c)(2). It is equally legitimate and important for government to ensure that subsidized mailing privileges are not abused; i.e., that publications having little or no demonstrable value to their recipients are not mailed at public expense.

We find that the paid-subscriber rule is rationally related to the objective of limiting subsidized second-class mailing privileges to publications which can objectively be determined to have value to their recipients.[5] The rule reflects the judgment of Congress that a publication distributed to paid subscribers is more likely to be desired and read by its recipients than an unsolicited publication, and the Enterprise has failed to point out any error of constitutional dimension in this judgment.

AFFIRMED.

---

5. To the extent that the Enterprise argues that the paid-subscriber rule violates the fifth amendment rights of those paying subscribers who are involuntarily subsidizing non-paying

recipients, it lacks standing to make that challenge. Warth v. Seldin, 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975).